the plaintiff. So that it is in possession, it has changed its situation, it has incurred enlarged liabilities, it has expended its money on improvements, and it holds the record title. But there is a cloud upon that title—a cloud of which it had no knowledge till years after the taking of possession, the change of situation, the making of improvements, the recording its deed, and the death of the donors, Mr. and Mrs. Rogers. Assuming that the donors had perfected their accepted gift by a deed giving a clear and unincumbered title in fee, they find an overdue alleged purchase-money mortgage for $600,000, $150,000 more than the cost to Mr. Rogers of the property and building, carrying a yearly obligation for $36,000 interest. It was not a purchase-money mortgage. It was an instantaneous transaction by which the property ostensibly got out of the ownership of Mr. Rogers just long enough to place a mortgage thereon, when it came back to his ownership permitting him to convey to plaintiff with this grievous burden, which did not represent a dollar of expenditure or indebtedness between any of the parties to the transaction. What his purpose was is unknown. It was never disclosed to the plaintiff in his lifetime.

It is a cloud upon the plaintiff's title. It was without consideration. It was a dummy transaction. It was perpetrated long after the taking of possession by the plaintiff. All this is admitted by the demurrer. There is no other way of characterizing the transaction than as a fraud on the plaintiff. Adopting resolutions of appreciation and thanks with public dedication, it finds its supposed generous donor has saddled it with the onerous burden of a $600,000, 6 per cent. mortgage which does not represent a dollar of actual money or indebtedness. To say that, such facts being conceded, as they are by the demurrer, no cause of action is stated in equity, is to leave a court of equitable jurisdiction helpless and useless. If these facts are established upon the trial, the court will have no difficulty in dispelling this most substantial and threatening cloud on plaintiff's title.

The order sustaining the demurrers to the complaint should be reversed, with $10 costs and disbursements, and the motion denied, with $10 costs to the appellant, with leave to the respondents to withdraw demurrers and answer over within 20 days and upon payment of said costs. All concur.

<hr>

(161 App. Div. 341)

NORTH BRITISH & MERCANTILE INS. CO. v. MERCHANTS' NAT. BANK.

(Supreme Court, Appellate Division, First Department. March 20, 1914.)

1. BANKS AND BANKING (§ 154*)—DEPOSITS—PAYMENT OF FORGED CHECKS—SUFFICIENCY OF EVIDENCE—CONTRIBUTORY NEGLIGENCE.

In an action by a bank depositor to recover the proceeds of checks fraudulently drawn by plaintiff's employés against plaintiff's account, evidence *held* to make it a jury question whether plaintiff by reason of its negligence in not examining its books should recover.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 502–512, 515, 516, 518–533; Dec. Dig. § 154.*]

<hr>

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date. & Rep'r Indexes

2. BANKS AND BANKING (§ 119*)—DEPOSITS—RELATION.

The relation between a depositor and a bank is that of debtor and creditor.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 289–292; Dec. Dig. § 119.*]

3. BANKS AND BANKING (§ 148*)—DEPOSITS—DUTY OF BANK.

A bank must know the signatures of its depositors and is primarily liable if it pays out money on forged checks unless the depositor's negligence contributed to the payment without any negligence upon the part of the bank.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 438–446, 451, 452; Dec. Dig. § 148.*]

4. BANKS AND BANKING (§ 148*)—PAYMENT OF FORGED PAPER—ESTOPPEL OF DEPOSITOR.

Defendant bank submitted to a depositor for execution an instrument by which defendant was authorized to deliver to the person named the depositor's passbook and take such person's receipt for the same in the form printed on the reverse side, and the depositor's cashier signed the instrument, which provided that, unless written notice to the contrary was given within 10 days from the date of the receipt, it was to be considered as accepted by the depositor as correct, and the agreement was acted upon by both parties until the fraudulent act of the depositor's employés in forging checks on the depositor's account was discovered. *Held,* that the depositor could not repudiate transactions under the agreement on the ground that its cashier had no authority to sign the agreement and the messenger to whom the passbook was delivered had no authority to sign the receipt, especially where the depositor was guilty of neglect in taking ordinary precautions to prevent the bank from being defrauded by the use of canceled vouchers called for by the passbook.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 438–446, 451, 452; Dec. Dig. § 148.*]

5. BANKS AND BANKING (§ 148*)—DEPOSITS.

The fact that a bank, which paid checks fraudulently drawn on a depositor's account by the depositor's employés, received the checks for payment from other solvent banks, so that if required to again pay their amount to the depositor it could seek reimbursement from the other banks, would not be ground for requiring it to again pay checks.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 438–446, 451, 452; Dec. Dig. § 148.*]

Hotchkiss and Dowling, JJ., dissenting.

Appeal from Trial Term, New York County.

Action by the North British & Mercantile Insurance Company against the Merchants' National Bank. From a judgment for plaintiff, defendant appeals. Reversed, and new trial ordered.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, DOWLING, and HOTCHKISS, JJ.

George A. Strong, of New York City, for appellant.

William H. Van Benschoten, of New York City, for respondent.

McLAUGHLIN, J. In addition to the facts set forth in the opinion of Mr. Justice HOTCHKISS, it should be stated that for some time prior to August 1, 1907, and during all of the time covered by the transactions here involved, the defendant, by the course of dealings between the parties, kept an account of all moneys received and paid out on checks, and on or about the 1st day of each month made

a detailed statement of all deposits and payments during the preceding month and delivered it, with the checks and passbook, to the plaintiff. The checks in question here were paid between the 1st of September, 1907, and the 15th of September, 1910. The first bogus check, for $44.99, was dated the 24th of August, 1907. It was paid by the defendant about that time, the amount charged to plaintiff's account, and a statement to that effect, together with the checks returned to the plaintiff about the 1st of September. The next one was in September, for $55.01; two in October, aggregating $41.77; two in November, aggregating $60.05; two in December, amounting to $34.03; and all amounting to $235.85. These checks were all negotiated by Bradford, as were all of those during the following months up to July, 1908, when Walker commenced operations. At first both Bradford and Walker purloined but few checks each month. Apparently, having ascertained how easy it was to defraud the plaintiff, they increased the number so that one month, acting either separately or together, they negotiated 23. Between August 1, 1907, and the 15th of September, 1910, the plaintiff deposited with the defendant $7,377,-903.78, and during the same time defendant paid out on checks drawn by plaintiff $7,367,151.56, and in addition it paid the checks here involved, which it is conceded bore the genuine signature of the plaintiff, amounting to $13,176.74.

Plaintiff's counsel conceded at the trial that there were returned by the defendant to it each month an average of over 600 check vouchers of an average aggregate amount of $200,000. No objection was made to the statements returned by the defendant to plaintiff, or to the payment of the checks here in question, until the 20th of September, 1910. The fraud was discovered by a check being presented to the plaintiff's cashier for signature, payable to the order of one Bauman. The cashier's assistant called his attention to the fact that they had only a few days before drawn a check for some thirty-odd dollars, payable to the order of a man named Bauman. On looking at that check they found Walker's name indorsed on it. This resulted in an examination, and Walker's confession also disclosed the frauds committed by Bradford. Many of the checks negotiated by him bore the indorsement of E. B. Wood. A further investigation followed, which showed that Bauman's indorsement appeared on forty-one checks, some of which had been returned to plaintiff by the defendant each month during 1909 and 1910, save January and March of the former year, and 87 checks which bore the indorsement of Walker, extending over the period of two years beginning July, 1908, and ending with August, 1910; that 218 checks bore the indorsement of Wood, which involved Bradford's fraud; and that the first fraudulent check bore Bradford's own indorsement. Had the slightest examination been made by the plaintiff of its books and the evidence in its possession, the fraudulent acts of Bradford would have been discovered when the bank returned the first bogus check with the other vouchers. And the same is true of the bogus checks returned each time when the passbook was written up. The plaintiff, however, did nothing for upwards of three years, and the result was that these two dishonest clerks

purloined 362 checks, put them into circulation, and the same were paid by the. defendant, concededly acting in good faith.

[1-3] Under such circumstances, I am of the opinion that a question was presented which should have been submitted to the jury, whether the plaintiff ought to recover upon any of the checks. The relation between a depositor and a bank is well understood. It is that of debtor and creditor. By reason of this relation a reciprocal duty is imposed. A bank is bound to know the signature of its depositors and pay out the money only on their orders. If it does otherwise, the bank, primarily, and not the depositor, must stand the loss. A bank, however, is permitted to escape liability for repayment of amounts paid out on forged, raised, or fictitious checks, by establishing that it made the payment in good faith, without negligence upon its part, and that the payment was brought about or contributed to by the negligence of the depositor; in other words, that the payment was made by reason of the neglect of the depositor to do "those things dictated by ordinary business customs and prudence and fair dealing toward the bank, which if done would have prevented the wrongdoing which resulted from their omission." Morgan v. U. S. Mortgage & Trust Co., 208 N. Y. 218, 101 N. E. 871. The facts here presented demonstrate very clearly the reasonableness of this rule. Commercial transactions are now carried on largely by means of checks. The plaintiff, as indicated, used in its business at least 600 each month, aggregating in amount something like $200,000. It therefore owed a duty not only to the defendant, but, I think, to the public generally, to exercise at least reasonable care that the checks which it signed were genuine and not fictitious transactions. If it failed to do this, then it ought not to be permitted to assert their invalidity against either the bank upon which they were drawn or any one else taking them in good faith and for value. When the first fictitious check was returned, and it is not here sought to recover on that one, if an examination had been made such as ordinary prudence would have seemed to dictate, Bradford's dishonesty would have been disclosed, and measures could have been taken would thereafter have prevented similar transactions either by him or Walker. The purpose of having the passbook written up was to ascertain what checks had been paid out and what the defendant claimed as to the plaintiff's account.

As said in Morgan v. U. S. Mortgage & Trust Co., supra:

"When they submitted their passbook to be thus written up, they in effect called for a statement of their account as kept by the bank, and, when this was furnished to them, is it to be thought that they satisfied the requirements of common prudence and fairness to the bank by absolutely disregarding the passbook and check list which could not be easily falsified, and simply comparing a bundle of vouchers which might be much more easily manipulated by ready abstraction of vouchers? The passbook is the statement of the bank's version of the account and the fundamental basis for comparison with the depositor's own records. The paid checks which are returned are the vouchers of the bank for its account as written on the passbook, and, if they are to be made the medium of comparison of accounts, the depositor at least ought to endeavor to know that they tally with the passbook. Otherwise he has made no reliable comparison or verification. Therefore it seems to me that, when the appellants relied for verification merely on a comparison of vouchers without any effort to verify these by comparison with the check list or passbook,

they did not exercise reasonable methods. On the other hand, it seems to me that when, having obtained from the bank a list of vouchers and balanced passbook which were intended to give and did give them a correct basis for comparison and verification, they disregarded these, they were guilty of such obvious oblivion of their duties that no extended argument can make plainer their negligence than does the mere recital of the facts."

[4] In connection with the duty imposed on the plaintiff to examine the returned canceled vouchers, so that any irregularity in their issue could be at once corrected, both for the protection of the defendant and the banking community in general, the defendant, in August, 1909, submitted to the plaintiff for execution by it an instrument by which the defendant was authorized to deliver to the person named the plaintiff's passbook and take his receipt for the same in the form printed on the reverse side thereof. The plaintiff, by its cashier, signed this instrument and delivered it to the defendant. This receipt was to show the balance at the close of business on the day specified, together with the list of canceled vouchers called for by the passbook, and, unless written notice to the contrary were given within 10 days from the date thereof, it was to be considered as accepted by the plaintiff as correct. Thereafter, on receipt of the passbook and vouchers, plaintiff's representatives signed such receipt. The plaintiff, however, seeks to repudiate this agreement on the ground that the cashier had no authority from the plaintiff to sign it and that the messenger to whom the passbook and vouchers were delivered had no authority to sign such receipt. But the agreement was acted upon by both of the parties from the time of its execution until the fraudulent acts of Bradford and Walker were discovered, and during such time it was not even suggested that the cashier did not have authority to make whatever arrangements were necessary with defendant as to its banking account. It was too late for the plaintiff, after thus receiving the canceled vouchers and statement of the account as shown by them, and the same had been acted upon by plaintiff, to thereafter repudiate the transactions, especially when it appeared that all of the checks were issued under circumstances which would justify a finding that the plaintiff had neglected to take even ordinary precautions to prevent the defendant or others from being defrauded by their use.

The plaintiff was resorting to the use of checks for the purpose of doing its business, and every one of those in question bore its genuine signature. The bank, of course, was bound to know that the maker's signature was genuine, and it is possible it was also bound to know that the indorsement on the first check was genuine; but, when no objection was made to it when returned, it had a right to treat other checks coming in as it had that one; in any event, after the statement and vouchers had been returned and no objection made within a reasonable time, then it seems to me it certainly was a question for the jury to determine whether or not the plaintiff was not bound by an implied ratification of the statements rendered. Dana v. Nat. Bank of the Republic, 132 Mass. 156.

If the plaintiff knew of the fraud, then it was bound to inform the defendant of it. It did, in legal effect, know of it, because its own records showed it, as the slightest examination of them disclosed.

Fair dealings require, under such circumstances, that it should be held to the statements as rendered, on the ground that it adopted the payments made and impliedly ratified them. Leather Manufacturers' Bank v. Morgan, 117 U. S. 96, 6 Sup. Ct. 657, 29 L. Ed. 811; Myers v. S. W. Nat. Bank, 193 Pa. 1, 44 Atl. 280, 74 Am. St. Rep. 672.

[5] But, it is said, the defendant ought not to escape liability because it received the checks for payment from other banks which are solvent, for which reason it will not be damaged. I do not think this conclusion follows. Defendant has paid the checks once, and, plaintiff having called upon it again to pay them, it has a right to resist the payment, irrespective of whether or not it may, in case it does pay, be reimbursed by some one else. A loss has been sustained, which, if occasioned solely by plaintiff's negligence, should be borne by it, and the defendant is in position to assert such defense—this upon the theory that one who, by his own neglect, is responsible for or the cause of a loss, should bear it instead of an innocent party. First Nat. Bank v. American Exch. Nat. Bank, 49 App. Div. 349, 63 N. Y. Supp. 58, affirmed 170 N. Y. 88, 62 N. E. 1089.

I am of the opinion that there was at least a question for the jury as to the negligence of the plaintiff that would prevent a recovery. The judgment should therefore be reversed, and a new trial ordered, with costs to the appellant to abide the event.

INGRAHAM, P. J., and LAUGHLIN, J., concur.

HOTCHKISS, J. (dissenting). The plaintiff was a depositor with the defendant and brought this action for a balance of account. What, if any, balance exists, depends upon certain checks which plaintiff claims were improperly paid by the defendant because of the alleged forgeries of the indorsements of the payees. The number of checks in dispute is 362, covering a period from August 1, 1907, to September 15, 1910. The plaintiff is an English company which maintains a principal office in the city of New York under the charge of a general manager, and through which plaintiff's business, including its many agencies in the United States, is directed. During the period in question, nearly 800,000 policies were sent from the New York office to the plaintiff's various agencies, and there was at all times outstanding on its books policies approximating 300,000 in number. When a policy was canceled before it had expired, it became necessary to pay to the holder a return premium representing the unearned portion of the original premium. The policies on account of which such payments were made amounted, during the period in question, to some hundreds of thousands. The individual amounts of the sums so returned were comparatively small; but, because of their great number, the aggregate amounted to about $90,000 a month, all of which was apparently drawn from the plaintiff's account with the defendant. The territory in which plaintiff transacted business was divided into districts, and, when an application for a return premium was received, it would be given over to a clerk who had charge of the returns within the district to which the policy concerned belonged, and thereupon it became his

duty to proceed as follows: From the canceled policy, the "daily report," and the "policy register," it was the duty of the clerk to make out on a printed form what was called an "account," showing certain particulars of the policy, the amount of the return premium, etc. The same clerk would also prepare an "order" on plaintiff's cashier for a check on defendant for the amount to be returned. The clerk would then pass the "account" and the "order" to the head of the accounting department, who would sign the "order" and send it to the cashier, with the voucher papers on which the order was based, attached. A check having been prepared by the cashier, it would be sent to the proper officers of the plaintiff for signature, after which the check would be returned to the head of the accounting department, and from him it would come to the hands of the clerk who had prepared the vouchers on which the check was based, and thereupon it became the duty of the clerk to see that the check was transmitted to the person entitled to receive the same.

Among the clerks employed in plaintiff's accounting department and whose business it was to prepare vouchers and checks for return premiums were Bradford and Walker, who, when the checks in question came back into their hands duly signed, purloined them and converted their proceeds to their own use. This conversion was accomplished in the following manner: In every case, the checks represented a fictitious transaction upon which no return premium was owing by the plaintiff, and each of the checks had been procured from plaintiff by means of fictitious vouchers on the faith of which the checks were signed. In some instances, the names of the payees of the checks were those of existing persons, some of whom were customers of the plaintiff, but to whom plaintiff owed nothing, and some were personal creditors of Walker, who took this method to pay his personal debts. The remaining payees represented persons having no existence. Of the checks payable to the order of existing payees, some were in fact indorsed by such payees; but on the others the indorsements were forged. The indorsements so forged and as well the indorsements of the checks payable to nonexistent payees were made by Bradford or by Walker or by the procurement of one of them. The frauds were discovered by plaintiff, and the defendant was notified early in September, 1910. Prior to August 2, 1909, it had been defendant's custom to return to plaintiff its passbook with canceled vouchers and to take a mere receipt for the same; but on that day defendant gave to plaintiff's bank messenger a new form of signature card with directions to have it signed by some one duly authorized and to return the same to defendant. On one side of this card was an order designating the individual to whom defendant should deliver returned vouchers, "taking his receipt for same in my behalf in form as on reverse hereof." On the reverse side was printed the following form of receipt:

"New York,          190  .

"Received, from the Merchants' National Bank of the City of New York passbook for the account of the undersigned, showing balance $          at the close of business,          together with          canceled vouchers called for by passbook and list of vouchers which are hereby accepted as correct and gen-

uine, and the account approved as stated, unless written notice to the contrary is given within ten days from this date."

This blank card was by the messenger delivered to Ketcham, an employé of the plaintiff with the title of cashier, and among whose duties was the making up of the daily deposits with defendant and the receipt and custody of all returned vouchers when the same were brought to plaintiff's office by the messenger. Ketcham was not an officer of the plaintiff and his duties were clerical only. Without calling the attention of any of plaintiff's responsible officers to the receipt of the card or to the new system of receipting for canceled vouchers which the terms of the card suggested, Ketcham filled in the name of the messenger, Thomas Baxter, as the one authorized in the future to receive from defendant and receipt for canceled vouchers, and so filled in, Ketcham signed the card in the name of the plaintiff, per "D. R. Ketcham, Cashier." The signed card was on August 2d returned to the defendant, from which date all of plaintiff's canceled vouchers were receipted for in the foregoing form. The fact that Ketcham had signed the card and authorized the giving of the form of receipt evidenced thereby was never brought to the knowledge of any representative of plaintiff authorized to contract in its behalf. On the trial much testimony was given both by plaintiff and defendant on the subject of plaintiff's alleged negligence in uttering the checks and as well in failing to adopt and enforce such a system of examination or audit as was adapted to disclose the fraudulent practices of its clerks.

At the conclusion of the trial, both sides moved to direct a verdict. Defendant's motion having been denied, it asked to go to the jury on a variety of questions including those raised on this appeal.

An analysis of the checks as they appear in the record shows that they were drawn to the order of payees and bore indorsements which are divisible into the following classes: (a) Checks to the order of existing persons; (b) checks to the order of nonexisting persons; (c) checks of class A indorsed by the identical payees named therein; (d) checks of class A bearing forged indorsements of payees.

The plaintiff recovered on all the checks of the several classes, on the theory that the payees' indorsements were forgeries, and counsel so argues on this appeal. In the case of checks to the order of and indorsed by existing payees, the theory is that, as to plaintiff, they are to be regarded as forgeries because plaintiff never intended to draw checks to such payees. The bank has thus been held liable not only in the case of nonexisting payees, but also in cases of existing payees whose indorsements were genuine.

(1) No argument is necessary to show that the court erred in cases of the latter class. As to these, the bank paid according to its instructions. If plaintiff was led by fraud or mistake into unintentionally giving to the bank orders to pay to persons to whom it owed nothing, the loss should fall on plaintiff whose error caused the payments to be made.

(2) The case of nonexistent payees is apparently covered by Hartford v. Greenwich Bank, 157 App. Div. 448, 142 N. Y. Supp. 387, decided by this court in June last. In that case, an employé of a tea com-

pany, a depositor in defendant bank, fraudulently induced his employer to sign checks to the order of a nonexistent person, in payment of bills which the employé led his employer to believe were owing by him to such pretended creditor. In fact, the name of such payees was one assumed by the employé himself and under which he had rented an office and received his mail in a distant part of the city. Under his assumed name, the employé opened an account with the Greenwich Bank. Having thus fraudulently procured the checks from his employer, the employé indorsed the same in his assumed name, and, so indorsed, deposited them with the defendant bank, from which he drew the proceeds. By a divided court, the bank was held not liable to the tea company for the loss. The reasoning of the court is summed up in the following sentences (at page 451 of 157 App. Div., at page 389 of 142 N. Y. Supp.):

"This is not strictly speaking the case of a check drawn to a fictitious or nonexistent person. * * * What we have here is a successful fraud perpetrated upon the tea company by one of its own employés, by which it was induced to believe that it owed that employé certain sums of money. The checks in suit were intended to be paid in satisfaction of this supposed debt and were in fact paid to the person for whom they were intended. No liability attaches to the bank under these circumstances."

The minority of the court pointed out that, while the majority assumed to base their decision on the intent of the drawer, they had in fact confused the matter of such intent with that of the identity of the payee, and in working out their legal conclusion had substituted the latter for the former. The error in a result thus obtained was pointed out in Philips v. Mercantile Nat. Bank, 140 N. Y. 556, 562, 35 N. E. 982, 983 (23 L. R. A. 584, 37 Am. St. Rep. 596), where Judge Gray, writing for the court, said:

"The fictitiousness of the maker's direction to pay does not depend upon the identification of the name of the payee with some existent person, but upon the intention underlying the act of the maker in inserting the name."

The minority in the Greenwich Bank Case placed their dissent on the ground that the indorsement of the name of the payee should be treated as a forgery, and that "the rule that a check payable to a fictitious payee is deemed payable to bearer has no application where the drawer of the checks is not aware that the payee is fictitious." At page 454 of 157 App. Div., at page 392 of 142 N. Y. Supp. (citing Shipman v. Bank of State of New York, 126 N. Y. 318, 27 N. E. 371, 12 L. R. A. 791, 22 Am. St. Rep. 821). As I read the Shipman Case, it decided exactly that on a state of facts indistinguishable from those in the Greenwich Bank Case. In the Shipman Case, plaintiffs were by the fraud of their clerk induced to sign checks to various classes of fraudulent payees, including some wholly fictitious who plaintiffs were induced to believe were clients of plaintiffs, to whom the sums represented by the checks were owing. But the question would seem settled by Seaboard Nat. Bank v. Bank of America, 193 N. Y. 26, 85 N. E. 829, 22 L. R. A. (N. S.) 499. In that case, one Pennock, an employé of Babcock & Co., a depositor of the Federal Bank, presented to that bank a check purporting to have been drawn on it by

Babcock & Co. to the order of "N. Y. Draft," but which check was in fact forged. In exchange for this check, the employé received from the Federal Bank a draft on plaintiff to the order of Carroll Bros. whose name Pennock indorsed on the draft which he deposited to his credit in the Mellon Bank. Carroll Bros. was an existing firm and dealers with Babcock & Co., but to whom the latter owed nothing. Plaintiff, having reimbursed the Federal Bank, brought action to recover the amount of the draft from defendant, the correspondent of the Mellon Bank, to which plaintiff had paid the draft, and judgment in plaintiff's favor was sustained. The court refused to treat Carroll Bros. as fictitious payees because, under subdivision 3 of section 28 of the Negotiable Instruments Law (Consol. Laws, c. 38) of this state, such an instrument payable "to the order of a fictitious or nonexisting person" is to be considered as payable to bearer only when "such fact was known to the person making it so payable." After pointing out that in this fact of knowledge lies the difference between our act and certain others, including the English Bills of Exchange Act, the court cites numerous commentators, who recognize the "New York rule," and also quotes with approval (at page 35 of 193 N. Y., at page 832 of 85 N. E. [22 L. R. A. (N. S.) 499]) the following very apt language from the Shipman Case:

"Hence if the maker or drawer supposes the payee to be an actually existing person (as for instance, where he is induced by fraud to draw the instrument to the order of a fictitious person whom he supposes to exist), the instrument will not be payable to bearer, and no person can acquire the title thereto by delivery. And where the instrument is drawn payable at a bank, the bank cannot charge the same to the account of its customer, since the instrument is not in such case payable to bearer and the instrument is a forgery."

The reason for the so-called "New York rule" is apparent and supports its propriety, and incidentally discloses what I deem to be the basic error of the decision in the Greenwich Bank Case. A check payable to a nonexistent person, necessarily, can never bear a genuine indorsement. Hence the drawer who is aware of such nonexistence cannot intend the check to be indorsed by the payee named and must be taken as intending it to be payable to bearer. But, if the fact of the payee's nonexistence is unknown to the drawer, presumably he relies on the drawee to see to it that payment is made as directed, and this casts the burden on the drawee to ascertain by identification or otherwise to whom he pays, and to pay only on a genuine indorsement. Naturally, if such an indorsement be impossible, the drawee should not pay at all.

It has been suggested that the Seaboard Bank Case is to be distinguished from that of the Greenwich Bank, because in the former the check of Babcock & Co. in exchange for which the Federal Bank issued its draft, was a forgery, but this fact the court took pains to point out (at pages 31 and 32 of 193 N. Y., 85 N. E. 829, 22 L. R. A. [N. S.] 499), was quite immaterial. The case of the Seaboard Bank was neither cited by counsel nor referred to in either of the opinions in the Greenwich Bank Case, and seems to have wholly escaped attention. If, however, it is, as I deem it to be, a controlling authority binding upon and which it was the duty of this court to follow when

deciding the Greenwich Bank Case, then I conceive it is no less our duty to accept it now. I conclude therefore that the defendant prima facie is liable on the class of checks in question.

(3) We have remaining, checks drawn to the order of existing payees whose indorsements were forged. This, among other points, brings directly up the question of plaintiff's negligence, to which subject the testimony at the trial was largely directed. The bank claims that, notwithstanding it may be liable prima facie on this class of checks and as well on any of the other classes on which, as I have hereinbefore pointed out, it is similarly liable, nevertheless it was error to direct a verdict against it, because:

(1) As to all the checks in dispute, the question of plaintiff's negligence should have gone to the jury.

(2) Defendant was released by the 10 days' limitation contained in the returned voucher agreement signed by Ketcham.

(3) As to all checks on which a claim was not made within one year after the return of the vouchers, defendant is released by section 326 of the Negotiable Instruments Law.

I take these questions up in inverse order.

(3) The statute says:

"No bank shall be liable to a depositor for the payment by it of a forged or raised check, unless within one year after the return to the depositor of the voucher of such payment, such depositor shall notify the bank that the check so paid was forged or raised."

On the face of the statute, it clearly does not apply. It is perfectly clear what forged and raised checks are. When we speak of a forged check, we mean that the maker's name is forged; a raised check is one the amount of which has been increased. Defendant attempts to extend the statute to the case of forged indorsements, on the theory that under the Penal Law forgery of a check includes the forgery and circulation of an indorsement. Obviously, if by the phrase "forged check" it was meant to include everything which the Penal Law defined as such, then there was no sense in using the term "raised" check, because that equally is a "forged" check. But defendant argues that its construction of the statute is reasonable because the depositor is much better able than the bank to ascertain the validity of an indorsement. This is manifestly untrue. The law is settled that ordinarily a depositor owes no duty to the bank to examine the indorsements on his returned vouchers, inasmuch as the obligation is upon the bank to make payment according to the drawer's directions, and hence it is the bank's duty to ascertain that it is making payment to the right person—a duty which the depositor may assume it has fulfilled when his checks are returned. Section 326 was originally enacted in 1904. There had shortly previous been a number of cases, including the Critten Case, 171 N. Y. 219, 63 N. E. 969, 57 L. R. A. 529, involving the liability of banks for forged and raised checks. There was much dicta and some language more or less equivocal in the books, but never until Morgan v. U. S. Mtg. & Trust Co., 208 N. Y. 218, 101 N. E. 871 (1913), was it squarely and finally settled that the depositor (as maker) owed to the bank the duty to make a reason-

ably careful examination of his returned vouchers, and more especially had it never been decided within what exact time he must notify the bank of errors. The law was that the notice must be within a reasonable time, which necessarily depended upon the circumstances of the case. Section 326 was adopted to settle both of these questions by making it incumbent on the part of a depositor whose signature to a check had been forged or whose check had been raised, to notify the bank within a year. It was a codification of substantive law. Shattuck v. Guardian Trust Co., 204 N. Y. 200, 97 N. E. 517. There may be a good reason for a statute requiring a depositor to notify the bank within a limited time of any irregularity in indorsements on returned vouchers; but, in the light of the law which relieves the depositor of any duty so to do (except as hereinafter considered), I think it useless to argue that the phrase "forged" check includes a forged indorsement.

(2) Prior to August 2, 1909, plaintiff had been doing business with defendant under a system by which returned vouchers were simply receipted for. Shortly after the decision in the Critten Case, there was a general movement among banks to protect themselves. This led to the adopting of a more stringent form of receipt for returned vouchers. Thus, this defendant adopted a form of receipt which, after acknowledging the return of the passbook with canceled vouchers as per list attached, said that the same "are hereby accepted as correct and genuine and the amount approved as stated, unless written notice to the contrary is given within ten days from this date." This new agreement was on August 2, 1909, signed in plaintiff's behalf by Ketcham, its cashier. The original seems to have been retained by defendant, and no copy was kept by or delivered to plaintiff. Although Ketcham held the title of cashier, he was in fact no more than a clerk whose duties included caring for the current cash, making deposits, and receiving returned vouchers. He never had actual authority to sign the new and modified returned voucher contract, and he never informed any one in authority that he had done so. Previous to the adopting of this new form as above stated, it was plaintiff's custom to give a simple receipt for the returned vouchers. I do not think that any express contract can be predicated of these facts. Ketcham had no authority to make such a contract. But do not the facts raise an implied agreement on plaintiff's part identical with the terms of the paper signed by Ketcham? I think so. When defendant sent to plaintiff, by Baxter, plaintiff's messenger, the new contract with directions to have it signed by some one in authority, and when that form of contract, accompanied by defendant's message, was presented to Ketcham, the communication came to an agent who represented plaintiff in the matter of returned vouchers. This amounted to notice to plaintiff of defendant's desire and intention, in the future, to be bound by and to do business only on the basis of the terms contained in the paper so presented to plaintiff for its acceptance. It then became plaintiff's duty to act in the premises. It could not remain silent and continue to do business with defendant, unless it was willing to accept defendant's conditions.

In the face of this notice, the subsequent transactions, defendant believing that it had a valid contract—must be deemed to have been pursuant to an implied contract between the parties, in short, a contract by offer and acceptance. See 1 Cyc. 256, 257, 258. If defendant's president had notified plaintiff's president that their future business must be done on the basis of the conditions set forth in the paper signed by Ketcham, and if after this, without dissent, plaintiff had continued to transact its banking business with defendant, can there be any doubt that the notice would have bound plaintiff? I think the notice delivered to Ketcham had the same effect. True, he had no power to enter into any express contract in the premises, but he was an agent representing plaintiff in the business in question, and, as such, it was proper for defendant to convey through him a notice to plaintiff with respect to this business, and, inasmuch as it thereupon became the duty of Ketcham to communicate this notice to plaintiff, he is presumed to have done so. Shattuck v. Guardian Trust Co., 204 N. Y. 200, 207, 208, 97 N. E. 517. Plaintiff having failed to dissent from, and defendant having relied on, this apparent acquiescence, the contract resulting is one made not by Ketcham, but by plaintiff itself. It is argued that the effect of any such notice was not to conclude plaintiff, but at most to establish an account stated, which it could open for fraud or mistake. I cannot so regard it. Any such construction would disregard the words "hereby accepted as correct and genuine," which precede the words "and the account approved as stated." These words refer back to "canceled vouchers." As "vouchers," the returned checks included the indorsements of the payee. Plaintiff's ratification and adopting of these "vouchers" and its release of defendant from responsibility for their genuineness and sufficiency as valid charges, unless objection should be made within ten days, was the manifest purpose of the new form of contract and the clear purpose of the language used therein. No words of this character were necessary if the intent of the contract was merely to effect an account stated. A mere return of the balanced passbook and the canceled vouchers would have accomplished this. No receipt, much less any words of express contract, was necessary. Plaintiff was bound by the limitation of ten days. In Matter of New York L. & W. R. R. Co., 98 N. Y. 447, 453.

(1) The negligence asserted is of two kinds: Negligence in signing and uttering the checks, in that plaintiff failed so to safeguard its system for their issuance as to afford reasonable protection from such frauds as those by which it was victimized, and, as well, negligence in failing to take any reasonably adequate means to discover the extensive and long-continued frauds after they had begun. If, in any view of the case, either of those questions was material, I should advise reversal on this ground, because I think, in that event, the evidence of negligence was such as to require the facts (except as to the checks which bore genuine indorsements of existing payees on which I deem defendant not liable in any event), to be submitted to the jury.

But in my opinion, any negligence on plaintiff's part is quite immaterial. In the Shipman Case, Judge O'Brien said (at page 327 of 126

N. Y., at page 372 of 27 N. E. [12 L. R. A. 791, 22 Am. St. Rep. 821]):

"Payments made upon forged indorsements are at the peril of the bank, unless it can claim protection upon some principle of estoppel or by reason of some negligence chargeable to the depositors."

To hold plaintiff responsible for negligence in failing to discover and notify defendant of the frauds would present difficulties, the mere suggestion of which at once discloses their importance. See Knox v. Eden Musee Co., 148 N. Y. 441, 458, et seq., 42 N. E. 988, 31 L. R. A. 779, 51 Am. St. Rep. 700; People v. Bank of North America, 75 N. Y. 547, 556, 562; Bigelow on Estoppel (6th Ed.) 710 to 716. But for other reasons, I think the question of any negligence on plaintiff's part, whether in the inception of the checks or thereafter, is unavailable to defendant.

The answer contains no allegation that the defendant has suffered or that it will eventually suffer any loss in case it is forced to respond to its prima facie liability on any of the checks. On the contrary, it was conceded that in each and every instance plaintiff is protected from loss by the prior indorsement of a solvent bank through which the checks passed in the course of their collection from defendant. The Critten Case (171 N. Y. 219, 229, 63 N. E. 969, 57 L. R. A. 529) is express authority for the proposition that, under such circumstances, a bank which has paid checks to which the maker's name has been forged is not relieved from liability, even though the drawee of the check is chargeable with negligence in the transaction. In such case, the bank may only recoup for its damages, if any; this because the rule in all cases where negligence is asserted is that, to be an effective basis of legal right, damage must have resulted. This is equally true where negligence is alleged as ground of estoppel, for the only basis of estoppel is injury of some kind. Having suffered no injury and anticipating none, any negligence on plaintiff's part is quite beside the case. Nor may we speculate as to whether, in the case of some prior indorser, near or remote, the defense of plaintiff's negligence may not be good. No such indorser is now before the court, and our judgment should be based solely on the rights of the parties to the cause in hand.

If the foregoing views are correct, they lead to the following result: Defendant is in no event liable on checks to the order of existing payees and indorsed by them; defendant is prima facie liable on checks to the order of nonexisting payees; it is likewise so liable on checks to the order of existing payees whose indorsements were forged; but, because of the returned voucher agreement, it is not liable on any checks drawn after the date of that agreement and returned to plaintiff more than 10 days before defendant was notified of the frauds.

DOWLING, J. (dissenting). I concur in the dissenting opinion of Mr. Justice HOTCHKISS, except in so far as it holds that the defendant is not liable on checks drawn after the date of the alleged agreement made with the plaintiff, namely, August 2, 1909. As Ketcham, termed a cashier, was no more than a clerk, with duties extremely limited in their nature, and as he had no authority to make such an

agreement as that by which the plaintiff is sought to be bound, I fail to see how, in the absence of power to make an express agreement, he was vested with power to create such a situation by his acts that plaintiff would be bound by an implied agreement to the same effect as that of the claimed express agreement.

For these reasons I do not concur in the dissenting opinion in so far as it holds the defendant not liable on any checks drawn after the date referred to.