Peter McCornack et al., Appellees, v. Central State Bank, Appellant.

BANKS AND BANKING: Deposits—Payment of Checks—Fictitious
1  Payee. The *absolute* duty of a bank, before it pays its depositor's check, to know that the payee's indorsement is genuine, and to pay only on such genuine indorsement, applies to a check which the depositor has unwittingly and without negligence made payable to a *fictitious* person.

> Evans and Albert, JJ., dissent.

FORGERY: Elements—Fictitious Payee. Principle recognized that the
2  indorsement of a check payable to a fictitious payee, by one to whom the drawer did not intend payment to be made, is forgery.

BILLS AND NOTES: Construction—Maturity—Fictitious Payee. A
3  check unwittingly made payable to a fictitious person is not payable to bearer.

BANKS AND BANKING: Deposits—Unintended Payee. When a check
4  is unwittingly made payable to a fictitious payee, and delivered to the assumed and supposed agent of such fictitious payee, and the supposed agent indorses the check in the name of the payee and receives the money thereon, it may *not* be said that the money was paid to the very person to whom the drawer intended it to be paid.

BILLS AND NOTES: Construction—Admitting Existence of Payee.
5  The statutory provision that by drawing a check the drawer "admits the existence of the payee and his then capacity to indorse" (Sec. 9521, Code of 1924) is solely for the protection of the holders in case the drawee fails to pay. The statute does not, in case a check is unwittingly and without negligence made payable to a fictitious person, relieve the drawee of the duty to ascertain the identity of the indorser and the genuineness of the indorsement.

> Evans and Albert, JJ., dissent.

BANKS AND BANKING: Deposits—Forged or Raised Check—Liability
6  of Bank. The statute (Sec. 9266, Code of 1924) which relieves a bank from liability for paying a forged *check* unless it is notified of the forgery within six months after it has returned to the depositor the voucher showing payment has no application to the payment of a genuine check on a forged *indorsement*.

ACCOUNT STATED: Conclusiveness—Fraud or Mistake. An account
7  stated may always be opened for fraud or mistake.

**BANKS AND BANKING:** Deposits—Estoppel to Question Payment.
8 The right of the drawer of a check to question the payment of the check on a forged indorsement is lost by such negligent delay as deprives the drawee of the opportunity to recoup his loss from the party committing the forgery.

Headnote 1: 7 C. J. p. 686. Headnote 2: 26 C. J. pp. 899, 921. Headnote 3: 8 C. J. p. 179 (Anno.) Headnote 4: 7 C. J. p. 678. Headnote 5: 7 C. J. p. 686. Headnote 6: 7 C. J. p. 686. Headnote 7: 1 C. J. p. 709. Headnote 8: 7 C. J. p. 686.

Headnote 3: 5 R. C. L. 497. Headnote 7: 11 A. L. R. 586; 1 R. C. L. 217. Headnote 8: 3 R. C. L. 537.

*Appeal from Polk District Court.*—JAMES DELAND, Judge.

DECEMBER 16, 1926.

REHEARING DENIED APRIL 7, 1927.

The plaintiffs, having funds on deposit in the defendant bank, sued to recover, as for a conversion, the amount paid by the bank and charged against the deposit upon a check drawn by plaintiffs to the order of a fictitious person as payee, where the check was obtained from the plaintiffs by fraud of one who indorsed the check in the name of the payee and received the money. There was a verdict for the plaintiffs, and from judgment thereon the defendant appeals.—*Reversed and remanded.*

*George E. Brammer,* for appellant.

*Volney Diltz* and *Parsons & Mills,* for appellees.

VERMILION, J.—It appears without dispute that the appellees, residents of Des Moines, had money in excess of the amount here involved, on deposit in the appellant bank; that one Halverson gained the confidence of the appellee Peter McCornack, and represented to him that he (Halverson) had a client who wished to borrow money, to be secured by mortgage on land; that McCornack consented to make the loan, and thereafter Halverson delivered to McCornack a note purporting to be signed by C. R. Kutsman, and secured by mortgage on land in Story

1. BANKS AND BANKING: deposits: payment of checks: fictitious payee.

County purporting to be signed by C. R. Kutsman and Mable Kutsman, and McCornack signed a check for $1,005.50, payable to the order of C. R. Kutsman, which he delivered to Halverson, for Kutsman; that Halverson indorsed the name C. R. Kutsman and his own name on the check, and deposited it in his account in the Shaffer State Bank at Altoona. The check was paid, on presentation to the appellant bank, and the amount charged to the account of the plaintiffs. · This transaction took ·place in July, 1920. In 1924, it was discovered that the note and mortgage which Halverson had delivered to Peter McCornack were forged instruments; that no such person as C. R. Kutsman in fact existed; and that the land described in the mortgage belonged to others. Payments of interest had been made by Halverson. It is upon this state of facts that the charge of conversion made in the petition is based.

It further appears that, on one previous occasion, and in numerous instances after the transaction in question, Halverson, by like fraudulent means, obtained other checks from McCornack, which he cashed by the same procedure; and that, in August following the giving of the check in question, the appellant delivered to the appellees a statement of their account, accompanied by the canceled checks charged against it, including the one here involved; that the statement bore the words "Please examine at once. Failure to report errors in this statement within 12 days will release the Central State Bank from all liability;" and that no claim of error was made until in May, 1924. It also appears that, on numerous dates from March, 1921, to February, 1924, Halverson had on deposit in another bank amounts largely in excess of the amount of the check, but owed indebtedness to the bank that, in the language of the witness, "on the average exceeded his average daily balance." In 1920, he owned a farm worth $40,000, with an incumbrance of $10,000 on it, and in 1923, the farm was worth $24,000, with incumbrances amounting to $22,000. He was later adjudged a bankrupt.

The pleaded defenses, briefly stated, were: (1) That the check was paid to the person to whom McCornack intended payment to be made. (2) That the appellant bank was guilty of no negligence. (3) That the appellee Peter McCornack was guilty of negligence in making the check, in that he failed to

ascertain that the payee was a fictitious person. (4) That, by the acceptance without objection of the statement of their bank account, with the check in question canceled and charged against it, there was an account stated, and plaintiffs were thereby estopped to claim that the check was improperly paid. (5) That, by the failure to notify appellant of the alleged irregularity in the payment of the `check within six months after receiving such statement, the claim was barred by the statute of limitations. (6) That appellees were guilty of negligence in not sooner notifying appellant of the alleged error in the payment of the check, for the reason that they knew, or should have known, that Halverson was receiving the proceeds of checks turned over to him under similar circumstances, and so received the proceeds of the check in question; and that appellant suffered loss thereby, in that, for a considerable time after paying such check, Halverson was financially responsible, but when such notice was given, he was insolvent; and that thereby plaintiffs were estopped.

This epitome of the answer does not correspond to its numbered divisions, some of which were stricken out on motion, but embodies the substance of the matters pleaded in defense and relied upon in this court.

The fraudulent scheme which is the occasion for the controversy is by no means a new one. Its counterpart, in all essential details, and others bearing many points of similarity, have been many times before the courts, resulting in the application of certain well established and clearly defined principles. Such confusion as is to be found in the adjudicated cases is usually to be accounted for by the application of the law to the facts, rather than in the statement of the controlling principles themselves, although there are cases that in some respects run counter to what we believe to be the great weight of authority.

I. We have said that it is a bank's business to see to it that its depositor's money is expended according to his directions, and that every expenditure is at the bank's risk of the validity of the direction and of the genuineness of the indorsement conveying title to the holder. *German Sav. Bank v. Citizens Nat. Bank,* 101 Iowa 530.

"The implied contract between the banker and his depositor in regard to the depositor's checks is that the banker will pay

them from his deposit to the persons to whom he orders payment to be made.  When a definite order is made in the check, the duty of the banker is absolute, as a general rule, to pay only in accordance with the order.  If payment is to be made to the order of a person named in the check, and if he orders the payment to be made to another person, it is the duty of the banker to see that the signature of the payee is genuine." *Jordan Marsh Co. v. National Shawmut Bank,* 201 Mass. 397 (87 N. E. 740, 22 L. R. A. [N. S.] 250).

This rule will be found variously stated in practically all the cases to which we shall have occasion to refer, and in many others that might be cited.

II.  It is clear, upon the record, that, through the fraud of Halverson, McCornack was induced to draw the check in question, payable to a fictitious payee to whom he believed he was making a loan.

"To constitute forgery, the name alleged to be forged need not be that of any person in existence.  It may be wholly fictitious, if the instrument is made or altered with intent to defraud * * *"  26 Corpus Juris 899.

The indorsement of a check payable to a fictitious payee, by one to whom the drawer did not intend payment to be made, is forgery.  *Shipman v. Bank of State of New York,* 126 N. Y. 318 (27 N. E. 371, 12 L. R. A. 791) ; *Jordan Marsh Co. v. National Shawmut Bank,* supra; *Armstrong v. National Bank,* 46 Ohio St. 512 (6 L. R. A. 625) ; *United Cigar Stores Co. v. American Raw Silk Co.,* 184 App. Div. 217 (171 N. Y. Supp. 480) ; *Padgett v. Young County* (Tex. Civ. App.), 204 S. W. 1046; *First Nat. Bank v. Farmers & Merch. Bank,* 56 Neb. 149 (76 N. W. 430) ; *Harmon v. Old Detroit Nat. Bank,* 153 Mich. 73 (17 L. R. A. [N. S.] 514) ; *American Exp. Co. v. Peoples Sav. Bank,* 192 Iowa 366.

2. FORGERY: elements: fictitious payee.

A check payable to the order of a fictitious person with the knowledge of the drawer is payable to bearer.  Section 9469, Code of 1924.  But where the fact that it is payable to a fictitious person is unknown to the drawer, the bank upon which it is drawn, on paying it, is in no different position from where it pays a check payable to a real party upon a forged indorse-

3. BILLS AND NOTES: construction: maturity: fictitious payee.

ment. *Shipman v. Bank of State of New York,* supra; *Harmon v. Old Detroit Nat. Bank,* supra; *Los Angeles Inv. Co. v. Home Sav. Bank,* 180 Cal. 601 (182 Pac. 293); *American Exp. Co. v. Peoples Sav. Bank,* supra; *Robertson Banking Co. v. Brasfield,* 202 Ala. 167 (79 So. 651).

McCornack did not know that the payee was a fictitious person; the check was not, therefore, payable to bearer; and the bank cannot escape liability upon that ground.

III. It is insisted that the bank paid the check, through intermediate indorsing banks, to the person to whom McCornack intended it should be paid.

It is held that, where an impostor represents himself to be another, whether the person whom he so impersonates be a real or fictitious person, and procures a check payable to the order of such person, the bank is protected in paying the check to the impostor, because it made payment to the person to whom the drawer intended it should be made, no matter what name he assumed. *United States v. National Exch. Bank,* 45 Fed. 163; *Karoly Elec. Const. Co. v. Globe Sav. Bank,* 64 Ill. App. 225; *States v. First Nat. Bank,* 17 Pa. Sup. Ct. 256; *Russell v. First Nat. Bank,* 2 Ala. App. 342 (56 So. 868); *Montgomery Garage Co. v. Manufacturers L. Ins. Co.,* 94 N. J. Law 152 (109 Atl. 296); *Crippen, Lawrence & Co. v. American Nat. Bank,* 51 Mo. App. 508; *Townsend, Oldham & Co. v. Continental St. Bank* (Tex. Civ. App.), 178 S. W. 564. But where one represents himself to be the agent of a fictitious person, and fraudulently procures the delivery to himself of a check payable to the order of such fictitious person as payee, and secures the payment of the check to himself by indorsing the name of the fictitious payee upon it, in the absence of estoppel or negligence on the part of the drawer, the loss, as between the drawer and the bank upon which it is drawn, must be borne by the latter. *Los Angeles Inv. Co. v. Home Sav. Bank,* supra; *Figuers v. Fly,* 137 Tenn. 358 (193 S. W. 117); *Russell v. First Nat. Bank,* supra; *Murphy v. Metropolitan Nat. Bank,* 191 Mass. 159 (77 N. E. 693); *First Nat. Bank v. Farmers & Merch. Bank,* supra; *First Nat. Bank v. Pease,* 168 Ill. 40 (48 N. E. 160); *Armstrong v. National Bank,* supra. See, also, note in 22 A. L. R. 1249.

Here, it cannot be claimed that McCornack intended the

4. BANKS AND BANKING: deposits: unintended payee.

check to be paid and the money to go to Halverson. He intended it to be paid to Kutsman, the payee of the check, and his intention in that respect is not affected by the fact that there was no such person as Kutsman, so long as he was in ignorance of that fact.

Many cases are cited which are claimed to support the contention of appellant at this point. Examination of them discloses that, in those where recovery against the bank paying the check was denied, facts were presented which, it was claimed, brought the case within the rule that obtains where the perpetrator of the fraud represented himself to the drawer of the check as the person named as payee, or the check was paid to, or bore the indorsement of, the person to whom the drawer intended payment to be made.

IV.   The obligation of a bank is absolute that it will pay only in the manner directed by the depositor; not that it will exercise reasonable care and diligence to do so.  *Los Angeles Inv. Co. v. Home Sav. Bank,* supra; *Union Tool Co. v. Farmers & Merch. Nat. Bank,* 192 Cal. 40 (218 Pac. 424); *Jordan Marsh Co. v. National Shawmut Bank,* supra; *Murphy v. Metropolitan Nat. Bank,* supra; *Armstrong v. National Bank,* supra; *Dana v. National Bank of the Republic,* 132 Mass. 156; *Dodge v. National Exch. Bank,* 30 Ohio St. 1; *Shipman v. Bank of State of New York,* supra; *Brixen v. Deseret Nat. Bank,* 5 Utah 504 (18 Pac. 43); *Guaranty St. Bank & Tr. Co. v. Lively,* 108 Tex. 393 (194 S. W. 937); *Figuers v. Fly,* supra.

The appellant bank, in paying the check, was bound to know, at its own risk, that the indorsements by which the holder of the check claimed title were genuine. Its liability for a payment not in accordance with the direction of the drawer, as evidenced by the check, did not depend upon negligence, but upon a violation of its implied contract with its depositor. The claimed fact that it was not shown to have been negligent is, in and of itself, no defense to a liability predicated on a failure to observe an absolute duty. The question whether the bank was negligent, or exercised due and reasonable precautions to ascertain the genuineness of the indorsements in paying the check, is immaterial upon the naked and primary question of its liability for having paid a check upon a forged indorsement. The question of the drawee's negligence may arise where there is ground

for saying that the drawer was guilty of negligence, resulting in an estoppel, in issuing the check. It was so held in *Union Tool Co. v. Farmers & Merch. Nat. Bank,* supra, where there was an alteration of the checks which the drawer might have discovered by a comparison of the earlier returned checks with its records. But it was held that such an estoppel could not prevail if, notwithstanding the drawer's negligence, the paying bank was also negligent in not discovering the alterations and forged indorsements; that the bank could only avail itself of the drawer's negligence in such respect by way of estoppel where it was itself free from negligence in paying the altered checks bearing the forged indorsements. We do not have such a case here. But one similar previous transaction appears in the record. It is not shown when the check involved in that was returned to appellees. Furthermore, the appellant is not shown to have taken any precautions whatever to ascertain the genuineness of the indorsements on the check in question. On the trial below, it was stipulated by the parties that the check was paid by the appellant in the regular course of business, relying on the maker's signature and the indorsement of the person presenting the same for payment, and without inquiry as to the indorsement of C. R. Kutsman.

V. The facts appearing of record do not show that McCornack was guilty of negligence in making the check payable to one to whom he believed he was making a loan, and in delivering it to one who made application on behalf of the borrower to him for the loan. There is no showing that anything had then come to his knowledge respecting Halverson, to put him upon inquiry as to his honesty. This conclusion is abundantly supported by many of the cases herein cited. Moreover, there is nothing in the record from which it could be found that McCornack's failure to ascertain that the payee of his check was a fictitious person induced or contributed to the payment of the check by the appellant. *Seaboard Nat. Bank v. Bank of America,* 193 N. Y. 26 (85 N. E. 829, 22 L. R. A. [N. S.] 499). As pointed out in *Los Angeles Inv. Co. v. Home Sav. Bank,* supra, the forgery of the indorsement in reliance upon which the bank paid the check was distinct from the issuance of the check by McCornack, and Halverson could as easily have forged an indorsement upon

a check payable to the order of a real person. And, as said in *Jordan Marsh Co. v. National Shawmut Bank,* supra:

"But the whole duty of seeing whether there is a forgery of such an indorsement upon any check rests primarily upon the banker. The drawer of the check has nothing to do with that."

The drawer of a check who, through failure to discover the fraud that is being practiced upon him, makes a check payable to the order of a fictitious payee, in ignorance of that fact, stands in the same position with reference to the bank upon which it is drawn as where his check is payable to the order of a real person. His negligence in so drawing the check is immaterial, unless it directly and proximately affects the conduct of the bank in paying the check. *Jordan Marsh Co. v. National Shawmut Bank,* supra, and cases cited; *Armstrong v. National Bank,* supra; *Robertson Banking Co. v. Brasfield,* supra.

VI.   Appellant contends that McCornack, in drawing the check, must be held, under Section 9521, Code of 1924, to admit the existence of the payee and his then capacity to indorse, and that he cannot question the payment made by the bank upon the indorsement of the payee's name by Halverson. That section, so far as material, is as follows:

"The drawer by drawing the instrument admits the existence of the payee and his then capacity to indorse, and engages that on due presentment the instrument will be accepted or paid, or both, according to its tenor, and that if it be dishonored, and the necessary proceedings on dishonor be duly taken, he will pay the amount thereof to the holder, or to any subsequent indorser who may be compelled to pay it."

This statute would seem to be not for the benefit of the drawee, nor designed to relieve the drawee of the duty to pay out the drawer's money only in accordance with his order, but for the protection of holders of the paper in case the drawee refuses to pay. This is apparent from the entire section, which must be read together. It provides not only that the drawer admits the existence of the payee and his capacity to indorse, but that he engages that, upon dishonor and the necessary proceedings thereon, he will pay the amount to the holder or any subsequent indorser who may be compelled to pay it. There is here an engagement to pay only in case of dishonor by the

5. BILLS AND NOTES: construction: admitting existence of payee.

drawee, and then only to the holder or to an indorser who may be compelled to pay. There is no engagement to pay the amount to a drawee which has honored the check.

That this statute was not intended to relieve the drawee of the duty to ascertain the genuineness of the payee's indorsement is plain when we consider that Paragraph 3 of Section 9469 does expressly operate to relieve it of such duty, where the drawer knows the payee is a fictitious person, by making a check so drawn payable to bearer. Many of the cases say that a drawer has a right to make a check payable to the order of one whom he does not know. But, if the drawer does not know the payee, he cannot know whether he exists or not. If, however, under Section 9521, the fact that a check is payable to a fictitious person relieves the drawee of the duty to know the genuineness of the indorsement of the payee, the check is, in effect, payable to bearer whether the drawee knew that the payee was fictitious or not. We are required to so construe the statute as, if possible, to give effect to all its parts. But to construe Section 9521 so as to relieve the drawee of the duty to know the genuineness of the payee's indorsement, where the check is, without the knowledge of the drawer, payable to a fictitious person, is to destroy entirely Section 9469, by imposing, in all cases where the check is payable to a fictitious person, the result that it is payable to bearer, a result that Section 9469 declares shall follow the making of a check so payable to a fictitious person when the drawer so knows. With Section 9521 so construed, Section 9469 has no function to perform.

The fact that, under Section 9522, the acceptor, by accepting the instrument, engages to pay it, and admits the existence of the payee and his capacity to indorse, lends no support to the contention that the drawer of a check must know at his peril that the payee is not a fictitious person. What the drawee admits by its acceptance is precisely what the drawee of a check drawn on funds on deposit with it must, at its peril, know before it pays the check. It is only what, as between it and the drawer of the check, it is required to know, and the very thing the drawer has a right to assume it will know before paying the check,—that is, the genuineness of the payee's indorsement.

So, too, Section 9520, providing that the maker of a negotiable instrument by making it admits the existence of the payee

and his then capacity to indorse, we think throws no light on the present question. The maker of a note is also the payer; it is his obligation, and his alone. There is no intervening party to the instrument between him and the payee, sustaining any duty to him. It is clear that the holder of the instrument is the only party for whose benefit the admission imposed by statute on the acceptor or maker is intended, and these statutes and cases construing them tend to support our conclusion that the same thing is true of the admission imposed by statute on the drawer.

The statute has been held applicable where the instrument was payable to a corporation not authorized to do business within the state. *Young v. Gaus,* 134 Mo. App. 166 (113 S. W. 735) ; *Despres, Bridge & Noel v. Hough Drug Co.,* 123 Miss. 598 (86 So. 359). In such case there is no question but that the drawer intended the payee named to receive the money, and he is held to admit the capacity of the payee to do so. The same thing is true of *Hill v. McCrow,* 88 Ore. 299 (170 Pac. 306), where a note was payable to the order of a firm which the maker believed to be the owner of certain corporate stock which he was buying, and the note was indorsed by one who did business in that name, but who did not own such stock. It was said that the fact that the person who indorsed did not own the stock went to the question of fraud, and did not involve the law as to a fictitious payee.

But when the payee is a fictitious person and this is unknown to the drawer, the statute does not, we think, have the effect to bind the drawer by an indorsement of the name of the payee by one to whom he did not intend payment to be made. In *American Exp. Co. v. Peoples Sav. Bank,* supra, where, on the record then presented, it appeared that the payees of certain drafts were fictitious, we said:

"True, the drawer, by drawing the instrument, admits the existence of the payee, and his then capacity to indorse. Section 3060-a61. This, however, confers no authority upon the purchaser to indorse the name of the payee and negotiate the instrument."

This identical question was before the Supreme Court of Alabama in *Robertson Banking Co. v. Brasfield,* supra. After quoting the section in question (the same as our Section 9521), the court said:

''How this section harmonizes with Subdivision 3 of Section 4966 [the same as our Section 9469], unless it applies to all instruments other than those payable to bearer, we are not called upon to decide; for, as above stated, the check in question was not payable to bearer, and if Section 5016 [our Section 9521] makes Brasfield [the drawer] admit the existence of the payee, Johnson, and his capacity to indorse the check, this would but strengthen the reason and necessity of obtaining a genuine indorsement before paying the check. The section does not make Brasfield admit that anyone other than his named payee could properly and legally indorse the check.''

Furthermore, the statute in question is but declaratory of the common law. 8 Corpus Juris 63; *Platte Valley Bank v. Harding*, 1 Neb. 461; *Exchange Nat. Bank v. Capps*, 32 Neb. 242 (49 N. W. 223). No exposition of the common law corresponding to the interpretation appellant would give to the statute can, we think, be found in the books. What was said in the case of *Lane v. Krekle*, 22 Iowa 399, had reference to the relation between the holder and the maker of a note payable to bearer, and obviously concerned a very different situation from that here involved. In *Jordan Marsh Co. v. National Shawmut Bank*, supra, it was inquired whether the making of a check payable to a fictitious or nonexisting person through negligent failure to discover the fraud by which the check was obtained, stood differently from the making of a check to an actual person, in reference to the effect upon its payment by the drawer, and the court said:

''We are of opinion that there is no difference in law. In either case it is the duty of the bank to see that there is a genuine indorsement.''

See, also, *United Cigar Stores Co. v. American Raw Silk Co.*, supra; *Shipman v. Bank of State of New York*, supra.

There are cases, among which *Marcus v. People's Nat. Bank*, 57 Pa. Sup. Ct. 345, is frequently cited, that appear to determine the whole question of liability between the drawer of a check payable, without the drawer's knowledge, to the order of a fictitious person, and the drawee bank, paying the check on a forged indorsement,—at least where it cannot be said that payment was made to the very person intended by the drawer,—by the application of the doctrine that, as between two innocent

parties, he who by his act makes the loss possible must bear it. It seems to us that this loses sight of a controlling consideration, and indeed begs the question, by assuming that both parties were innocent,—the very question at issue.   The parties are not *equally* innocent, unless we are to reconstruct entirely the relation between a bank and its depositor, and restate their respective duties.  If a depositor has a right to draw a check payable to the order of one whom he does not know, and who, therefore, for aught he knows, may be a fictitious person, and to rely upon the bank to pay the check only on a genuine indorsement, and it is the duty of the bank to know at its peril, before it pays the check, that the indorsement of the payee is genuine, how can it be said, in case of payment on a forged indorsement, that the parties are equally innocent?   The drawer has done what he had a right to do, and what is done every day in ordinary course of business, and the bank has failed to do what its duty to its depositor required of it.  If it had demanded a genuine indorsement, as it was its duty to do, before honoring the check, since there could be no such thing in the case of a fictitious payee, the check would not have been honored.  In such case, an innocent holder, upon taking proper steps, would have been protected by Section 9521.  The purpose of that section was to protect the innocent holder of dishonored paper,—not the drawee who paid it in violation of duty.

We think that the statutory provision that the drawer of a negotiable instrument admits the existence of the payee and his capacity to indorse is not to be construed as rendering an instrument payable to bearer, when it is payable to the order of a fictitious person and the maker is in ignorance of that fact; or as imposing on such drawer an admission of the validity and genuineness of an indorsement of the payee's name thereon by one to whom it cannot be said he intended payment to be made; or as relieving the drawee of the duty to ascertain the identity of the indorser and the genuineness of the indorsement.

VII.   Section 9266, Code of 1924, provides:

"No bank shall be liable to a depositor for the payment by it of a forged or raised check unless within six months after the return to the depositor of the voucher of such payment, such depositor shall notify the bank that the check so paid is forged or raised."

This section was in force at the time the check in question was cashed, as Section 1889-a, Code Supplement of 1913. It is

6. BANKS AND BANKING: deposits: forged or raised check: liability of bank.

claimed that appellees' cause of action is barred under this statute. Prior to the enactment of the statute, we had held, in *German Sav. Bank v. Citizens Nat. Bank*, supra, that a depositor was under no duty to the bank as to the genuineness of an indorsement. We said:

"The check was returned with an apparent genuine indorsement of Quinlan. The fact that intervener had paid the money thereon, and presumably had satisfied itself that the indorsement of Quinlan was genuine, as it was in duty bound to do, was a further reason why plaintiff should not, in the absence of knowledge to the contrary, have concerned itself as to the genuineness of the indorsement of Quinlan's name thereon. Furthermore, the plaintiff owed no duty to the defendant, or to the intervener, as to the genuineness of. the indorsement of Quinlan."

See, also, 7 Corpus Juris 688; *Los Angeles Inv. Co. v. Home Sav. Bank*, supra; *Shipman v. Bank of State of New York*, supra; *Jordan Marsh Co. v. National Shawmut Bank*, supra; *Armstrong v. National Bank*, supra; *United Sec. Life Ins. & Tr. Co. v. Central Nat. Bank*, 185 Pa. St. 586 (40 Atl. 97); *Brixen v. Deseret Nat. Bank*, supra; *Murphy v. Metropolitan Nat. Bank*, supra; *Grand Lodge of A. O. U. W. v. State Bank*, 92 Kan. 876 (142 Pac. 974, L. R. A. 1915B 815); *Leather Manufacturers' Nat. Bank v. Morgan*, 117 U. S. 97 (29 L. Ed. 811); *Third Nat. Bank v. Merchants' Nat. Bank*, 76 Hun (N. Y.) 475.

The statute does not, we think, change this rule in respect to the genuineness of the signature of indorsers. The indorsement is no part of the check as made by the drawer, although it is, of course, contemplated that the payee must indorse it. But, since the maker is not required to know the signature of the payee, and has a right to issue the check payable to the order of one unknown to him, relying on the bank to pay only in accordance with his direction, a forged indorsement does not make the check a "forged check," within the meaning of the statute. In *Union Tool Co. v. Farmers & Merch. Nat. Bank*, supra, cited by appellant, there was, in addition to a forged indorsement, an

alteration on the face of the check. We are of the opinion that the action is not barred by the statute in question.

VIII. The contention that the return of the canceled check with the balanced pass book constituted an account stated, is met by the proposition that an account stated may always be opened for fraud or mistake. *Los Angeles Inv. Co. v. Home Sav. Bank,* supra; *Shipman v. Bank of State of New York,* supra; *Jordan Marsh Co. v. National Shawmut Bank,* supra; *Leather Manufacturers' Nat. Bank v. Morgan,* supra.

7. ACCOUNT STATED: conclusiveness: fraud or mistake.

IX. It is claimed that the appellees were guilty of negligence in failing to discover the fraud of Halverson after the payment by the bank upon the forged indorsement, and that the bank suffered prejudice therefrom, in that, had it been notified at an earlier date, it could have protected itself by a recovery against Halverson. We think there was sufficient evidence to require the submission of this question to the jury.

8. BANKS AND BANKING: deposits: estoppel to question payment.

As we have said, this was one of the first of a number of similar transactions. Thereafter, numerous checks drawn by McCornack payable to persons Halverson claimed to represent were returned to appellees. with indorsements indicating that Halverson had received the money thereon. In August, 1923, McCornack gave to Halverson a check for $4.00, which, when returned a short time later, with the balanced pass book, had been raised to $400. The change was apparent on the face of the check. These circumstances, with the general course of dealing between Halverson and McCornack, were sufficient, we think, in connection with the evidence of Halverson's changed financial condition, to make it a jury question whether appellees were guilty of negligence in not sooner discovering and notifying the appellant of the fraud, and whether such negligence operated to the prejudice of the bank. *Brixen v. Deseret Nat. Bank,* supra; *Dana v. National Bank of the Republic,* supra; *Hardy v. Chesapeake Bank,* 51 Md. 562 (34 Am. Rep. 325); *Pratt v. Union Nat. Bank,* 79 N. J. Law 117 (75 Atl. 313); *North British & Merc. Ins. Co. v. Merchants' Nat. Bank,* 161 App. Div. 341 (146 N. Y. Supp. 720).

It follows that the lower court was in error in striking Divisions III and IV of the amendment to the answer, and in failing

to submit to the jury, under proper instructions, the questions whether appellees were guilty of negligence in not sooner discovering the fraud and notifying appellant thereof, and whether appellant suffered prejudice therefrom and appellees were thereby estopped. We are also of the opinion that appellant was unduly restricted in its examination of Peter McCornack as its own witness upon the subject of his relations with Halverson, as bearing upon the charge of negligence in failing sooner to discover the fraud.

X. It follows from what has been said that there was no error in overruling appellant's motion for a directed verdict or in refusing the requested instructions.

Because of the errors pointed out, the judgment is reversed, and the cause remanded.—*Reversed and remanded.*

DE GRAFF, C. J., and MORLING, J., concur.

STEVENS and FAVILLE, JJ., specially concur.

EVANS and ALBERT, JJ., dissent.

FAVILLE, J. (specially concurring).—I concur in the opinion of Mr. Justice Vermilion, except as to Division IX thereof. I do not think there is any question of negligence in this case to submit to the jury.

I would affirm.

STEVENS, J. (specially concurring).—The writer fully concurs in the opinion of the majority, and is induced to file this special concurrence by the filing of the dissent by Mr. Justice Evans. The question is one of great importance, and fully justifies the wide range of discussion in both the majority and the dissenting opinions. The point of divergence in the views of the respective members of the court is the construction to be placed upon Section 61 of the Uniform Negotiable Instruments Law (Section 9521, Code of 1924). This section is quoted in both the majority and dissenting opinions. The first clause of this section, which provides that the drawer by drawing the instrument admits the existence of the payee and his capacity to indorse the same, must be limited to the terms and purposes of the section. The engagement of the drawer is that the instrument on due presentment will be accepted or paid, or both, and

that, if it be dishonored *and the necessary proceedings on dishonor are duly taken,* he will pay the amount to the holder or to any subsequent indorser who may be compelled to pay it. The engagement, therefore, of the drawer is to the holder or indorser who has been compelled to pay the amount represented by the instrument. No greater liability can be created by construction. Section 191 of the Negotiable Instruments Act (Section 9652 of the Code of 1924) defines a holder as the payee or indorsee of a bill or note who is in possession of it, or the bearer thereof. An indorser is defined by Section 63 (Section 9523 of the Code) as any person placing his signature upon an instrument otherwise than as *maker, drawer,* or *acceptor.* The *drawee* cannot, therefore, be either a *holder* in due course or an *indorsee* of a check, draft, or other bill of exchange, within the meaning of Section 61 (Section 9521 of the Code). *Balsam v. Mutual Alliance Tr. Co.,* 74 Misc. Rep. 465 (132 N. Y. Supp. 325) ; *National Bank of Rolla v. First Nat. Bank of Salem,* 141 Mo. App. 719 (125 S. W. 513) ; *Commercial & Sav. Bank Co. v. Citizens Nat. Bank,* 68 Ind. App. 417 (120 N. E. 670) ; *Farmers' & Merch. Bank v. Bank of Rutherford,* 115 Tenn. 64.

Payment by the drawee necessarily retires the instrument from circulation, and therefore all indorsers are relieved from liability to the bank on the warranty implied by such indorsement. The liability of an indorser extends only to subsequent holders in due course. Section 66, Negotiable Instruments Law (Section 9526 of the Code). The drawee is in no sense a holder in due course. The authorities are uniform in holding that payment by the drawee discharges the indorsers on their warranty; but, as pointed out in the opinion of the majority, a liability based upon negligence, or for money had and received, will sometimes lie. *Balsam v. Mutual Alliance Tr. Co.,* supra; *National Bank of Rolla v. First Nat. Bank of Salem,* supra; *First Nat. Bank v. Bank of Cottage Grove,* 59 Ore. 388 (117 Pac. 293) ; *Figuers v. Fly,* 137 Tenn. 358 (193 S. W. 117).

Thus it is clear that Section 61 is in no manner designed to protect the drawee of a check. The drawee is not only not included in its terms, but is necessarily excluded thereby.

The inapplicability of Section 61 to the drawee does not always result in a denial thereto of a remedy. Likewise, under some facts, the drawer may be precluded by his negligence from

recovering of the drawee for loss resulting from the payment of a check payable to a fictitious person, and bearing a forged indorsement. It is practically the uniform holding of the courts that a drawee bank which has paid a check drawn by a depositor to a fictitious person without knowledge that he is such, is not discharged from liability to the drawer although the check bears the purported indorsement of such fictitious person, as such indorsement constitutes a forgery. *Chism, Churchill & Co. v. Bank*, 96 Tenn. 641 (36 S. W. 387); *Robertson Banking Co. v. Brasfield*, 202 Ala. 167 (79 So. 651); *Hatton v. Holmes*, 97 Cal. 208 (31 Pac. 1131); *Harmon v. Old Detroit Nat. Bank*, 153 Mich. 73 (116 N. W. 617); *Shipman v. Bank of State of New York*, 126 N. Y. 318 (27 N. E. 371); *Guaranty St. Bank & Tr. Co. v. Lively* (Tex. Civ. App.), 149 S. W. 211; *First Nat. Bank v. Brule Nat. Bank*, 41 S. D. 87 (168 N. W. 1054).

As is clearly pointed out in a number of the cases cited supra, and in the majority opinion, the bank, ordinarily at least, pays the check to its depositor at its peril. It is charged with the duty of paying out the funds of the depositor only upon his order.

Thus far, reference is to the decisions in other jurisdictions. While the point was not actually involved in *First Nat. Bank v. Marshalltown St. Bank*, 107 Iowa 327, the court in that case said that the drawee ordinarily has no recourse upon indorsers. In the course of the opinion in that case, we said:

"But, whatever the text-writers may think, a long line of authorities sustain the proposition that, as between the drawee and a good-faith holder of a check, the drawee bank is to be deemed the place of final settlement, where all prior mistakes and forgeries shall be corrected and settled once for all; and if overlooked, and payment is made, it must be deemed final. There can be no recovery over."

As bearing upon the questions involved in this case, attention is called to the annotations in 12 A. L. R. 1089 and 22 A. L. R. 1228.

In the authorities cited in the dissent, particular attention is called to *Marcus v. People's Nat. Bank*, 57 Pa. Sup. Ct. 345. This case does not refer to or purport to construe any provision of the Negotiable Instruments Law. The holding is that a drawer who delivers a check to a swindler, payable to a fictitious

payee, when the swindler indorses the name of the fictitious payee and obtains payment thereof, cannot recover of the drawee his loss, for the reason that, where two innocent persons must suffer, the one at fault must bear the loss. The court in this case attributed the wrong to the drawer, who put the check in circulation. The court apparently overlooks the universal rule that it is the duty of the drawee to pay the check to the person named therein, or upon his genuine or authorized indorsement, and that it does otherwise at its peril. The only reference we have been able to find to this opinion is in *National Union Fire Ins. Co. v. Mellon Nat. Bank,* 276 Pa. St. 212. The reference to it in that case was for the purpose of distinguishing the two cases, and nothing was said approving or disapproving the holding. The doctrine of the *Marcus* case is entirely out of harmony with the general rule, and, so far as appears, has no support in any adjudicated case, but, on the contrary, is against the overwhelming weight of authority, which places the burden upon the drawee. The quotation in the dissent from *McMann v. Walker* is found in 31 Colo. 261 (72 Pac. 1055). The question involved in that case was whether a note executed to a corporation not authorized to do business in the state of Colorado was valid in favor of third persons who obtained such note before maturity and without notice of its infirmities. Its validity was sustained.

*National City Bank v. National Bank of the Republic,* 300 Ill. 103 (132 N. E. 832), involved the construction of Section 62 of the Negotiable Instruments Law (Section 9522, Code of 1924). This section defines the liability of an acceptor. The instrument involved in that case was purchased by a mercantile company of St. Louis from the Broadway Savings Trust Company, drawn on the National City Bank, and made payable to the order of the Sheet & Tin Plate Company, of Pittsburg. One Manning secured the letter from the mail box after it had been therein deposited by the manufacturing company, and by some means completely erased the name of the payee, and inserted his own therein. Manning delivered the draft to a jeweler in Chicago, by the name of Barnett, who took it to the drawee for acceptance, and it was accepted thereby. Barnett later indorsed the draft to the National Bank of the Republic, receiving credit on his account therefor. Notice was promptly sent to the National City Bank that the draft had been altered, and credit was asked

upon its account with the Chicago bank for the amount thereof. The drawee, in turn, notified the National Bank of the Republic of the alteration, and asked reimbursement. The drawee bank gave the drawer credit for the amount, and instituted suit against the National Bank of the Republic, to recover the amount paid. The plaintiff prevailed in the lower court and in the court of appeals, but met with a reversal in the Supreme Court. The case there turned on the construction to be given Section 62 of the Uniform Negotiable Instruments Law. The court held that the acceptance by the drawee discharged the drawer from liability, and that the liability assumed by the acceptor extended only to the payee named in the instrument, and not to the original payee, whose name had been completely erased by Manning and his own substituted therefor. Thus it appears that the case is in point only in so far as the court held that the drawer was discharged by the drawee's acceptance of the draft. To the same effect see *State Bank of Chicago v. Mid-City Tr. & Sav. Bank,* 295 Ill. 599 (129 N. E. 498).

The language of the dissent in *Robertson Banking Co. v. Brasfield,* supra, has never had the approval of any court in this country, and is contrary to the doctrine of the cases cited and many more readily available.

*Lane v. Krekle,* 22 Iowa 399, is perhaps in no particular out of harmony with Section 61 or any other section of the Negotiable Instruments Law. Neither the liability nor the rights of a drawee of a check were involved in any way in that case. The court, however, held the defendant, who executed a note to a fictitious payee, liable to a subsequent purchaser for value without notice of the defects, upon two grounds: First, that the instrument was payable to bearer; and, second, that the defendant, by the execution of the note to a fictitious payee, estopped himself from denying liability to such holder.

Section 61 of the Negotiable Instrument Act relates to the drawer, and was designed to protect indorsees and holders in due course. The holding on the second point finds its counterpart in the statutes relating to holders of negotiable promissory notes in due course.

It is the opinion of the writer that Section 61 affords no protection whatever to the drawee, but that its terms must be construed as applicable only to the holder or indorsee in due

course.  As already pointed out, this does not in all cases deprive the drawee who has paid a check upon a forged indorsement of a remedy, but his remedy is not upon the warranty of the indorser. Such warranty, within the meaning of Section 66 of the act, is available only to subsequent holders in due course.  Not only is this the specific language of the act, but such is the uniform construction placed thereon by the courts of this country.

The right of the drawee to recover of an indorser, when such right exists, is rested by the decisions upon three principal grounds: (1) The negligence of the first indorser or a holder, (2) mistake, and (3) for money had and received.  An indorser held liable on one of these grounds would be in no position to recoup his loss from the drawer.  The drawer does not undertake to protect indorsers or holders against their own negligence, nor against liability on the ground of mistake, or for money had and received.  The engagement of the drawer is that the instrument will be paid or accepted, or both, and that, if dishonored, and proper proceedings are taken, on dishonor, he will pay it to the holder or a subsequent indorser.  The theory of the dissent that the course of liability proceeds in a circle is not correct; and the right of the drawer to recover of the drawee who has paid a check purporting to be signed by him, but the signature to which is a forgery, or where payment is made upon a forged indorsement, is absolute, in the absence of negligence on the part of such drawer which operates as an estoppel and precludes recovery by him.  The exceptions are where the instrument is made payable to a fictitious person with the knowledge of the drawer, and when the check is drawn and made payable to the person intended, although in fact fictitious.

With the exception noted, as the writer understands the law, the loss in all other cases lies between drawee and indorser.

Evans, J. (dissenting).—I.  I am unable to concur in the majority view.  I do not object to the reversal of the judgment below, nor to Division IX of the majority opinion, which is the reversing division.  My objection goes to the holding of the majority upon what may be termed the ultimate merits of the case.  This plaintiff drew his check unwittingly to a fictitious payee, and put it in circulation by delivery to a trusted servant, who proved to be a very unfaithful one.  The check was drawn

on the defendant-bank, against an account which was ample to meet it. This check was negotiated by the wrongdoer, Halverson, to the Altoona bank, carrying indorsements apparently regular. The Altoona bank parted with full value, and had no notice of the spurious character of the payee, or of any irregularity in the check or its indorsement. Defendant, as the drawee bank, paid the same to the Altoona bank, in like ignorance of any irregularity. I think that the rights and liabilities of the parties are governed by Section 61 of the Uniform Negotiable Instruments Act (Section 9521, Code of 1924), and that the effect of such section is to bar recovery to the plaintiff. Such section is as follows:

"The drawer by drawing the instrument admits the existence of the payee and his then capacity to indorse, and engages that on due presentment the instrument will be accepted or paid, or both, according to its tenor, and that if it be dishonored, and the necessary proceedings on dishonor be duly taken, he will pay the amount thereof to the holder, or to any subsequent indorser · who may be compelled to pay it. But the drawer may insert in the instrument an express stipulation negativing or limiting his own liability to the holder."

It is held by the majority that this section of the act was not intended for the benefit of the drawee bank, and that it in no manner lifted from the drawee bank the absolute duty of such drawee bank to know that all indorsements upon the check were genuine before it paid the same, and that this section was intended only for the benefit of an intermediate innocent holder of such check. To say that this statute was not intended for the benefit of the drawee bank, if innocent, is to put an arbitrary construction upon the statute. There is nothing in the language of such statute which purports to except any innocent person from its benefit. Moreover, it cannot operate in favor of the intermediate holder without operating *upon* the drawee bank. By the terms of this statute the maker of the check "engages" two alternatives: (1) That, on due presentation, the instrument *will be accepted or paid,* or both, according to its terms; (2) and that, if it is dishonored, * * * he will pay the amount thereof to the holder or to any subsequent indorser who may be compelled to pay it.

Inasmuch as the engagement of the drawer is that the

drawee will pay the check upon presentment, then the payment of the check by the drawee is necessarily a performance of the engagement of the drawer.  To say in such a case that the drawee was bound to secure a *genuine* indorsement is to destroy the statute, so far as its application to a spurious payee is concerned.  There can be no *genuine* indorsement by a spurious payee.  If the statute is to operate at all in favor of any holder of a check payable to a spurious payee, it must so operate without a *genuine* indorsement.  When Halverson negotiated this check in apparently legal form to the Altoona bank, he fully gathered the fruit of his fraud, and a corresponding loss to someone had already ensued.  Who was the loser at this point? Not the drawee bank, because it had not then paid the check. But the loss had fully accrued, and rested either upon the Altoona bank, as the holder of the check, or upon the plaintiff, as the drawer thereof.  Under this statute, that loss was imposed upon the plaintiff; and that would be so upon either alternative stated in the statute.  Upon payment of the check by the drawee, the plaintiff's loss was not increased nor made more certain. If the drawee bank had refused payment for any reason, whether lack of funds or other cause, the plaintiff, as drawer of the check, would be liable therefor to the innocent holder.  As between him and the holder, he had engaged to pay the check himself, if the drawee bank dishonored it.  It follows, I think, that the liability of the plaintiff to make good this check to the holder became fully accrued the moment that Halverson put it in circulation by negotiation to such holder.  Plaintiff's loss, therefore, was not increased, nor did any damage accrue to him, when the drawee bank paid the same and thereby discharged the obligation which the plaintiff had assumed, under the statute. That the reasoning of the majority at this point is faulty is indicated by the "vicious circle" which results from it.  Under the law, the last indorser who presents the check to the drawee and receives payment therefor becomes liable to the drawee bank for the return of the money thus paid, upon discovery that his title was affected by a forged indorsement.  In this case, the Altoona bank was the innocent holder of the check.  But it held its title under a forged indorsement.  If such forged indorsement vitiated its title to the check, as the majority opinion now holds, then the drawee bank may demand from it the return of

the money thus paid, in reliance upon its apparent title. This liability is predicated by some courts on the theory that one who presents a check for payment impliedly warrants his title thereto; by other courts it is predicated upon other grounds,— the principal one being that the money was paid by mistake of fact. Under Section 61 of the Negotiable Instruments Act, the drawer of the check is liable (or at least *was*) to the Altoona bank, as the innocent holder of the check. The result, therefore, is that the drawee is liable to the drawer; the innocent check holder is liable to the drawee bank for the return of the money paid; and the drawer is liable to the innocent check holder, under the statute. These respective liabilities might well be deemed to cancel each other automatically and to leave the parties *in statu quo.*

II. As to existing law prior to the adoption of the Negotiable Instrument Act, it is sufficient to say that the authorities were in irreconcilable conflict upon the question which now divides us. The majority opinion contains an exhaustive review of those authorities, which cast the loss in such a case upon the drawee. The contrary view is held by many authorities. Our own court committed itself in an early day to such contrary view. *Lane v. Krekle,* 22 Iowa 399. In that case we said:

"Upon reason and principle we are clear that, if the plaintiff is a bona-fide holder for value and without notice, the fact that the note is made payable to a fictitious person is no defense. *In such case, the defendant would be estopped, as against the plaintiff, from setting up the fact.* It was the defendant who made the note. *By making it payable as he did, he affirmed the existence of such a person as the payee therein named;* and he should not, against a person ignorant of that fact, one who may reasonably be presumed to have acted upon the faith of the fact thus represented, be allowed to assert the contrary. This principle of estoppel *in pais* has a very extended and just application in the law of bills and notes, the doctrines of which are *designed to give credit* and *circulation to negotiable paper,* and to that end throw its protection around the honest and fair holders thereof. See *Frazer v. Massey,* 14 Ind., 382; 1 Parsons on Notes and Bills, 560, 589; Id., 244; Story on Notes, Section 80; Edw. on Bills, 250; *Hogg v. Skeen,* 114 Eng. C. L., 426, 432, per Willes, J.; *Erwin v. Downs,* 15 N. Y., 575; *Smith v. Lusher,* 5

Cow., 688, 711. *In respect to such a holder, the maker is bound
to know that the payee is a real person, or thereafter 'hold his
peace.' "*

A case almost identical in its facts with the case at bar was
*Marcus v. People's Nat. Bank,* 57 Pa. Sup. Ct. 345. From the
opinion in that case I quote the following:

"There is no uncertainty in regard to the relation of a bank
to its depositor with reference to the payment of the checks of
the latter. The implied agreement of the bank is to pay such
checks to the persons therein appointed to be paid. If payable
to order, payment must be made to the payee, or to such other
person as is the holder by a genuine indorsement. Where pay-
ment from a depositor's account is made on a check containing
a forged indorsement, the bank remains liable to the depositor,
unless the party against whom it is sought to enforce such pay-
ment is precluded from setting up the forgery or want of au-
thority. This rule is embodied in the Notes and Bills Act of
1901. No specification is made, either in the decisions of the
Supreme Court or in the statute, of the acts which will estop the
party owning the fund from setting up a forgery; but it has
been well declared that, where the loss is the result of the draw-
er's own fault or neglect, he has no standing to complain of the
action of the bank in paying the check. It was said in *Iron
City National Bank v. Fort Pitt National Bank,* 159 Pa. 46, that
'it is always a good defense that the loss complained of is the
result of the complainant's own fault or neglect, and it would
require a statute in very explicit terms to do away with so uni-
versal a principle of law, founded on so incontestable a principle
of justice.' *A duty rests on a depositor not to subject the bank
to extraordinary risks with regard to the payment of his checks,*
such as intrusting a check to one who he has reason to suppose
will make a fraudulent use of it, or in so carelessly filling up a
check that it may easily be altered; and in *Land, Title and Trust
Co. v. Northwestern National Bank,* 196 Pa. 230, the *issuing of a
check to a* fictitious person was included in the class of acts
which deprived the depositor of the protection of the rule re-
ferred to. It was there said that its application is confined to
cases in which the depositor has done nothing to increase the
risk of the bank. This risk is increased when a check is issued
to a nonexisting person; for, as was stated in the case last cited,

the bank is deprived of the protection afforded by the fact that a bona fide holder of a check will exercise care to preserve it from loss or theft, which are the ordinary risks.   In the case of *Snyder. v. Corn Ex. National Bank,* 221 Pa. 599, **Mr. Justice** Brown quotes with approval from *Land, Title and Trust Co. v. Northwestern National Bank,* supra, as to the effect of issuing a check to a fictitious person and the effect of any act done by the drawer of the check increasing the risk of the bank.   There is no dispute with regard to the facts in the case before us, and the application of the law as expressed in the cases cited sustains the action of the trial judge.   It is conceded that the payees named in the checks did not exist; the checks were drawn by the maker payable to imaginary persons.   The plaintiff, having confidence in Moskovitz, accepted his statements that the transactions were loans to the persons named, and handed the checks to Moskovitz, to be delivered to the supposed borrowers.   The whole transaction was between the plaintiff and Moskovitz, so far as the pretended lending of money and the payment by the plaintiff to the borrowers were concerned.  'The *effect of the drawing of the checks on the bank was an implied representation by the drawer that the payees were existing persons,* and yet there could not be a genuine indorsement of such papers.   It is not reasonable to charge the bank with the consequences of the payment of a forged indorsement when the plaintiff put in circulation checks which were not susceptible of a genuine indorsement.   The case is one for the application of the rule that, *as between two innocent parties, he who by his acting makes loss possible must bear it.*   That the plaintiff was overconfident, and that he was cheated by Moskovitz, whom he was befriending, is very evident; but we are not persuaded that there is substantial ground for shifting the result of his credulity to the bank, which was in no way responsible for the putting of the checks in circulation.   The judgment is affirmed.''

English cases support the foregoing view.   I do not care to discuss the relative weight of authority on this question prior to the enactment of the present Uniform Act.   These precedents have all become obsolete as authority, by the enactment of the statute.   They are valuable now only as they form a background for the statute, and throw light upon its purpose and give some indication as to how it ought to be construed.   The formulation

of the Uniform Negotiable Instruments Act was not the work of novices. It was formulated by men learned in the law, and after many years of labor. The pre-existing conflict of authorities on the question furnished abundant reason why the question should be settled once for all by a uniform statute. In settling upon the form of such statute, one of the conflicting views was necessarily accepted, to the exclusion of the other. The view adopted by the statute, as I construe it, was that indicated in our own case of *Lane v. Krekle,* supra, and in *Marcus v. People's Nat. Bank,* supra. The question that divides us now is what is a proper construction of this statute. And this brings us to the question of precedents in the matter of such construction. The fact has its own interest that the construction of this particular section has been passed upon by only one court of last resort in this country. This was in the Alabama case of *Robertson Banking Co. v. Brasfield,* 202 Ala. 167 (79 So. 651). The majority view herein has the support of such precedent. By a divided court, four to three, the majority of the Alabama court held to the view which is now adopted by the majority of this court. Both majority and minority filed opinions. I cannot escape the conviction myself that the minority opinion in the Alabama case presents the sounder view. I am under some temptation to quote therefrom. Sufficient, however, to say that it supports this dissent.

The majority view in the Alabama case reduces Section 61 to a practical nullity. It holds, in substance, that the statutory admission imposed upon the drawer of the check does not import a waiver of a *genuine* indorsement. It holds, in substance, that no holder could take the check by a valid title without such *genuine* indorsement. This means necessarily that there could be no innocent holder of such check, within the meaning of the law, because there could be no *genuine* indorsement by a fictitious payee. Quoting from such opinion:

"The section does not make Brasfield [maker] admit that *anyone other than his named payee could properly and legally indorse the check.*"

Such holding necessarily protects the drawer against all possible liability. It puts a veto upon all negotiation, and the taker of the same, however innocent in fact, takes to his own loss. Such opinion has the merit at least of facing the ultimate

logical result of the protection which it extends to the drawer of the check. The majority opinion in the case at bar does not purport to go so far, and does not purport to withhold protection from the innocent holder. Of logical necessity, however, the protection of the drawer against the operation of this statute is the destruction of the innocent holder. The loss must fall somewhere. If it does not fall upon the drawer, under this section, it must fall upon the holder of the check, unless he in some manner can shift the loss to the drawee.

Though no other court of last resort has passed upon this particular section, two other courts of last resort have passed upon the analogous Sections 60 and 62. Sections 60, 61, and 62 of the Uniform Negotiable Instruments Act may be deemed full sisters. They are almost identical in their terms. Section 60 relates to the *maker* of an instrument; Section 61 to a *drawer* of an instrument; Section 62 to the *acceptor* of an instrument. The identical language which is applied to a drawer in Section 61 is applied to a maker and to an acceptor in Sections 60 and 62, respectively. To construe the language of one in that respect is to construe that of each. Section 62 was construed by the Supreme Court of Illinois in *National City Bank v. National Bank of the Republic,* 300 Ill. 103 (132 N. E. 832). The construction adopted by that court is that which is contended for in this dissent. In that case, the drawee accepted a check which was payable to a fictitious payee. The drawee was held absolutely liable to the holder upon its acceptance, though the later purported indorsement thereof by the payee was not, and could not be, genuine. The court said:

"*This construction of Section 62 is in accordance with that sound principle which declares that, where one of two innocent parties must suffer a loss, the law will leave the loss where it finds it. * * * If Section 62 means anything, it means just what it says: that is, by accepting this draft, appellee admitted the existence of the payee then named in the draft and the capacity of the named payee to indorse the draft.*"

In *McMann v. Walker,* 31 Colo. 261 (22 Pac. 1055), the Supreme Court of Colorado construed Section 60, and held the maker of a note drawn, as here, to a fictitious payee, liable, under the statute, to an innocent holder of the note, even though a *genuine* indorsement could never be had by any holder. In my

judgment, the two foregoing precedents should be deemed directly opposed to the Alabama precedent. The same language is construed in all three cases. If the construction adopted of Sections 60 and 62 by the Colorado and Illinois courts be correct, that of the Alabama court as to Section 61 is necessarily wrong.

(I may suggest parenthetically at this point that, in the companion case of like title herewith, wherein opinion is filed at the present sitting, the drawee-bank-defendant was an *acceptor* of the check drawn to a fictitious payee, and became such in advance of any spurious indorsement. This dissent is made applicable to such companion case. That case is identical at this point with the Illinois case supra.)

If, because of Section 60, the spurious indorsement of the name of a fictitious payee affords no defense to the maker, as against an innocent holder for value, as held in *McMann v. Walker,* supra, and if, because of Section 62, such spurious indorsement affords no defense to an acceptor of an instrument, as against an innocent holder thereof, as held in *National City Bank v. National Bank of the Republic,* supra, then, by the same rule of construction of Section 61, such spurious indorsement can afford no defense to the drawer of a check as against an innocent holder thereof. So far, therefore, as these three (and only) precedents are concerned, I deem it fair to say that two of them are against the Alabama case and the majority herein.

III. It is thought by the majority that the construction of Section 61 herein contended for nullifies, in effect, Section 9 (Section 9469, Code of 1924). This Section 9 makes a check knowingly drawn to a fictitious payee equivalent to a check payable to bearer. If the contention were good, I might retort that there is no more reason why Section 61 should be nullified, to save Section 9, than that Section 9 be nullified in order to give effect to Section 61. But I do not think that such is the effect of the construction of Section 61 here contended for. The two sections occupy quite different fields. Checks knowingly drawn to a fictitious payee are well known as a mere convenience in the commercial world. The fictitious payee inserted therein often operates as a mere memorandum of some transaction. It is often apparent upon the face of the instrument that the entity

indicated as the fictitious payee has no capacity to indorse. For instance, "Pay to cash," or "Pay to expense account for ——." Under Section 9, title to such a check passes by mere delivery.

Under Section 61, title does not pass by delivery, but passes by indorsement apparently regular. The operation of Section 61 in this respect has its very close analogy in those cases where an impostor assumes a false name, and fraudulently procures a check from a drawer, drawn payable to such false name. In such a case, it is held that an innocent purchaser takes good title from the wrongdoer, through the indorsement, apparently regular, of the false name incorporated in the check as payee. The holding in this respect is quite universal. This is conceded in the majority opinion, and the authorities are cited therein. In such a case, title is held to pass even though the indorsement *is not genuine.* Section 61, consistently construed, brings into operation the same principle, and applies it to checks drawn unwittingly to non-existent payees. This statute assumes that a check put in circulation by its drawer, payable to a non-existent payee, though unwittingly, carries the potential of injury to innocent persons. It purports to put the risk of such injury upon the maker of the check. He is deemed to proclaim a waiver of defense predicated upon the non-existence of the payee, and therefore upon the non-genuineness of the indorsement. If this admission or waiver is to be deemed operative at all, it must operate in favor of innocent persons who have been entrapped to their injury by the concealed infirmity of the instrument. Without this section there could be no innocent holder of the check, because the *genuine* indorsement of a non-existent payee could never be procured. The statute puts the maker in the attitude of saying, by such issuance, that the payee shall be deemed an existing person, and that an existing person is authorized to indorse such check by such name. The statute means either this or nothing.

I am thus contending now for the right of the innocent holder to recover on the check from the drawer. If the drawer is under such obligation to the holder, then he has no cause of action against the drawee because of the discharge of such obligation in his behalf.

IV. The contract of deposit between drawer and drawee, which was evidenced by a printed statement on the bank book of

the plaintiff, provided that, upon the balancing of the depositor's bank book, and upon the return of his checks, objections, if any, should be made within twelve days from the receipt of such checks. This contract was pleaded as a defense. The trial court in effect withdrew it from the consideration of the jury. No avoidance of it was pleaded or proved. The plaintiff in this case acquiesced in the payment of the check in controversy by the drawee for the period of four years after the check had come into his possession. I am unable myself to see what the deficiency is in this defense. It is said that the plaintiff did not sooner discover the fraud. But his opportunity to discover was quite equal to that of the drawee. Indeed, it was decidedly more advantageous. During all this time he held the purported note and mortgage of the non-existent payee of his check. He was reaping the fruits of his check by receiving interest payments from Halverson on the purported loan for which the check was given. The incongruous result of the trial below was that, though the drawer had received several years' interest on his supposed investment, he obtained judgment against the drawee for the full amount of his check, plus interest. The plaintiff actually profited by the fraud that was practiced upon him.

I would reverse on the various grounds herein indicated.

V. The concurring opinion filed herein by Mr. Justice Stevens becomes the occasion for this additional division to the dissent. Chronologically speaking, the concurring opinion is in the nature of a reply, as indicated therein, to the preceding divisions of this dissent. This division is intended to extend the dissent to such concurring opinion. Though this manner of the disposition of the cause in this court is somewhat out of the ordinary, the case itself is one of great importance, not only to the litigants, but to ourselves as a precedent, and has imposed upon us all the labor of much investigation, by reason of the great variety and contrariety of views expressed in the authorities upon controlling questions therein. The special purpose of this division is to cite authorities in support of such propositions as are used in argument in the foregoing divisions, which are challenged in the concurring opinion as being unsound.

(1) Preliminary to such purpose, I call attention first to the cases of *McMann v. Walker*, 31 Colo. 261 (72 Pac. 1055), and *National City Bank v. National Bank of the Republic*, 300 Ill.

103 (132 N. E. 832). These cases are cited in the foregoing Division II. Their facts are reviewed in the concurring opinion. The review is incomplete, in that it does not indicate the point of or ground of decision, nor does it recognize the applicability of the decision to the proposition to which it was cited.

In the *McMann* case, the defense set up was that the payee of the note was a corporation not authorized to do business in Colorado, and was, therefore, incapable of taking the note or of indorsing it,—becoming, in effect, a fictitious person. The plaintiff was an innocent holder. The court predicated decision solely upon Section 60 of the Negotiable Instruments Act, and held the maker liable on the note to an innocent holder, upon the statutory admission contained in such section.

In the other case, the drawee bank innocently certified a check which had been fraudulently altered, prior to such certification, by the insertion of the name of Manning as payee, in lieu of the true payee. It was presented thereafter for payment by Barnett, an innocent holder, who had relied solely upon the written acceptance. The court predicated decision solely upon Section 62, and held the drawee bank precluded thereby from setting up what might otherwise have been a good defense.

The reasoning upon which each of these decisions is based, if applied in the case at bar, would defeat the plaintiff herein.

(2) The concurring opinion repudiates the circle of liability referred to in Division II hereof. It were better, perhaps, to have referred to it as a triangle of liability. The opinion assumes to break the triangle by breaking one of its legs. It denies the liability of an indorser who holds a check under a spurious indorsement, and who receives payment thereof from the drawee, to return the money to the drawee, upon discovery of the forged indorsement, unless there be exceptional circumstances. To quote therefrom:

"The authorities are uniform in holding that payment by the drawee discharges the indorsers on their warranty; but, as pointed out in the opinion of the majority, a liability based upon negligence, or for money had and received, will sometimes lie."

The rule thus stated in such opinion is strictly limited in the authorities to cases where the forgery is in the signature of the maker. It has no application to cases of forged indorsement. The cases cited in the concurring opinion in support of the rule

are cases of forgery on the face of the instrument, and not on the back thereof. The liability of an indorser who has received payment of the check from the drawee, and whose title was defective because of a forged indorsement, is not predicated upon negligence, nor upon any fault of the indorser's. Some cases predicate it upon an implied warranty of title, some upon representation of title, and many more upon the simple ground of mistake. The rule of liability of an indorser to the drawee to return money received upon a defective title because of forged indorsement is distinctly different from the rule of liability in cases where the signature of the maker is forged. This proposition can be supported by reference to the most elementary sources.

The concurring opinion cites a valuable annotation in 12 A. L. R. 1089, 1090. This annotation purports to deal only with cases of forged signatures. Its preliminary statement is as follows:

"Because the proper solution of any given case depends solely upon its facts, and the rules applicable in case of *forged indorsements*, or altered paper which was originally genuine, may be different from those applicable to forged signatures of makers, the cases of the former class will not be considered in this annotation. * * * The rule being that money paid under mistake of fact may be recovered, and denying a drawee the right to recover money paid on forgery of the name of the drawer being an exception to the rule, the problem is to ascertain the scope and extent of the exception. In actual practice, the exception is confined within very narrow limits, and is entirely just and almost absolutely necessary to the stability of commercial paper."

In 10 L. R. A. (N. S.). 49 is another valuable annotation on the same subject. Its preliminary statement is as follows:

"An instrument with a forged indorsement upon it, or a raised check or draft, is usually, and perhaps properly, spoken of as a forged instrument. In cases of this class, however, there is a subsisting valid contract which is unlawfully changed, or to which an invalid incident is added; while the forgery of the signature to the instrument is literally a forgery of the instrument itself, invalidating it and all its incidents. This, together with the fact that, though there is some confusion in the cases,

the two classes of cases are *governed by entirely different rules*, recovery in case of payment on a forged indorsement or on a raised check or draft, depending upon common-law rules with reference to recovery of money paid by mistake, while recovery in case of a forged signature is usually controlled by the rule of commercial paper, that a drawee is deemed to know the signature of his correspondent, constituting an exception to the former rule,—has prompted the inclusion in this note of cases of forgery of the signature of the instrument as a whole only, and the reservation of the other class of cases for future consideration. So, the conflict of opinion and confusion existing with reference to this subject as applied to forged signatures furnish further grounds for specific consideration, there being at least three conflicting theories or rules as to the right of and grounds for recovery, and it being frequently difficult to determine which theory or rule has been adopted or acted upon.''

In 2 Daniel on Negotiable Instruments (5th Ed.) 374, the following sections indicate the state of the authorities:

''1355. * * * Under other circumstances, however, the maker may recover back the amount from the party to whom he paid it; for the holder, by the very act of assuming ownership and demanding its payment, impliedly asserts, even though it be without his indorsement, that he has clear title, and is entitled to receive payment.

''1358. * * * And on the same principle, the maker of a note, or the acceptor of a bill making payment to a holder under a forged indorsement, would be entitled to recover back the money.

''1363. * * * And when the signature is genuine, but the amount in the body of it has been altered after it left the drawer's hand, and he [drawee] has paid the excessive amount to a *bona fide* holder, he may recover it back from him, provided he was not himself negligent in disregarding evidences that the instrument had been tampered with, which appeared upon its face. And as the holder demanding payment warrants the genuineness of the instrument under which such demand is made, we should say that the negligence of the payor should be very great and positive, to deprive him of the right of restitution. * * *

''1364. * * * If the drawee or acceptor of a bill were to

pay it, and it turned out that the indorsement of the payee or a special indorsee were forged, the result would be that he could not charge the amount in account against the drawer, and that the payment would be invalid; but, as his act implies no admission of the genuineness of the indorser's signature, he could recover back the amount from the holder to whom he paid it. * * *

"1661. Where money is paid by the bank upon a 'raised' or altered check by mistake, the general rule is that it may be recovered back from the party to whom it was paid, as having been paid without consideration; but if either party has been guilty of negligence or carelessness, by which the other has been injured, the negligent party must bear the loss. This doctrine is clear, and is sustained by authority. The bank is not bound to know anything more than the drawer's signature, and in the absence of any circumstance which inflicts injury upon another party, there is no reason why the bank should not be reimbursed."

In 7 Corpus Juris 692, the rule is stated as follows:

"A bank which pays out money on a forged indorsement may recover the same from the person who receives the money, provided, of course, the bank has suffered some injury or loss in consequence of the forged indorsement; but in a case where a bank was directed by the drawer of a check not to pay it, but negligently failed to observe such direction, and, contrary thereto and without authority, paid the check two days thereafter, it was held not entitled to recover the amount thereof from an innocent holder who received the payment, on the ground that the indorsement was a forgery."

The propositions here quoted are sustained by the authors by citations of scores of authorities. Nor do they disclose that there are any authorities to the contrary on this particular question. It would extend this dissent unduly to quote from the authorities that are cited in support of the above texts. I content myself with a quotation from one of them,—*First Nat. Bank v. Northwestern Nat. Bank*, 152 Ill. 296 (38 N. E. 739). In that case the drawee paid checks which later proved to have carried forged indorsements. It brought suit to recover money from the holder to whom it paid the same. The court said:

"The estoppel, however, of which we have spoken, applies

only to the *case of the signature of the drawer, and of the drawer alone.* A drawee is bound to know the signatures of his own customers, and a bank is bound to know the signatures of those who deposit with it and draw checks against such deposits. But the drawee or bank is not chargeable with knowledge of any other signature on the bill of exchange or bank check, and by accepting or paying the bill or check does not admit the genuineness of any indorsement on it. 2 Daniel on Neg. Inst., Secs. 1364, 1365; *Marine Nat. Bank v. Nat. City Bank,* 59 N. Y. App. 67; *Canal Bank v. Bank of Albany,* 1 Hill [N. Y.], 287; *Vagliano v. Bank of England,* L. R. 22 Q. B. Div. 103; *Vagliano v. Bank of England* (on appeal), L. R. 23 Id. 243. And even if a drawer draws a bill or a check payable to himself or his own order, and at once indorses it, an acceptance or payment of it by the drawee admits only the genuineness of the drawer's original signature, but not the genuineness of his indorsement. * * * When appellant indorsed the nine checks, and collected from appellee the sums of money called for by them, it *warranted* the genuineness of all the preceding signatures indorsed on the respective checks, including the indorsements on the checks of the names of the respective payees named in such checks. (2 Parsons on Notes and Bills, 588; *Williams v. Tishomingo Savings Institution,* 57 Miss. 633; Story on Bills of Exchange, Sec. 225.) And where a drawee or a bank pays a bill of exchange or a bank check to an indorser who derives title through a prior forged indorsement, he may recover back the money so paid, on discovery of the forgery, provided he makes demand for repayment within a reasonable time after the discovery of such forgery.''

The universal application of the rule contended for is recognized and emphasized in those cases which hold against recovery by the drawee where the forgery was in the signature of the maker.

In *Germania Bank v. Boutell,* 60 Minn. 189 (62 N. W. 327), the forgery involved was that of the signature of the maker. It was paid, upon presentation, by the drawee bank. Upon later discovery of the forgery of the signature of the maker, the drawee brought action against the holder, who presented it, to recover money paid, and was denied recovery. Seymour was the forger, and was named as payee of the check. He forged

the names of his employers, Osborne & Clark. As payee, he indorsed the check to Boutell Bros., who took it innocently and for value. Boutell Bros. indorsed it, and presented it to the drawee for payment. In noting the distinctions to be observed in the consideration of the case, the court said:

"It is a well-settled rule of law that money paid under a mistake of fact may be recovered back, however negligent the party paying may have been in making the mistake, unless the payment has caused such a change in the position of the other party that it would be unjust to require him to refund. And the tendency of the modern authorities is to extend rather than to curtail the operation of this rule. One generally received exception to the rule is that, where the drawee of a bill of exchange, or the banker upon whom a check has been drawn, pays a bill or check upon which the drawer's signature has been forged, he must stand the loss, and cannot recover back the amount, if the party to whom he paid it was a bona fide holder. * * * And if the indorsement of Seymour had proved to be forged, they would no doubt have been liable to plaintiff, had it been thus led to pay the check to one not the owner of it; for by indorsing it they guaranteed to all persons, including plaintiff, the genuineness of the preceding indorsement. * * * The exchanges of commerce are now made almost entirely by means of drafts and checks. It was largely in deference to this fact that the recovery of money paid on paper of this kind, to which the *drawer's signature* was forged, was made an exception to the general rule as to the recovery of money paid under a mistake of fact."

It is suggested also that a strong tendency has been manifest in the later decisions to conform the rule involving the forged signature of the maker to the other rule involving only forged indorsements. The former rule was established in 1762 in the case of *Price v. Neal*, 3 Burr. 1355. It has usually been regarded in the judicial mind as a harsh rule, and it has been so regarded by the courts that have adopted it. The pressure of equitable principle has in this country widened the door of recovery to the drawee to some extent by the recognition of the special circumstances of the case as being sufficient to warrant the recovery. *First Nat. Bank of Danvers v. First Nat. Bank of Salem*, 151 Mass. 280 (24 N. E. 44). The rule as adopted by the

English court was an absolute one. In *McKleroy & Bradford v. Southern Bank*, 14 La. Ann. 458 (74 Am. Dec. 438), the forgery of the maker's signature was involved. The drawee sued for the recovery of money paid, and was allowed to recover. The court held that the drawee parted with its money on the faith of the indorsement of the holder; that the loss had already accrued to the holder before presentation, and that it should not be permitted to shift its loss to the drawee by the accidental failure of the drawee to discover the forgery at the time. In *Ford & Co. v. People's Bank*, 74 S. C. 180 (54 S. E. 204), the forgery of the signature to a draft was involved. The right of drawee to recover was sustained. The rule as stated in the case of *National Bank of N. A. v. Bangs*, 106 Mass. 441, and in *First Nat. Bank of Danvers v. First Nat. Bank of Salem*, 151 Mass. 280 (24 N. E. 44), was approved therein. The opinion states the following as the question to be answered:

"Does such presentation and indorsement to the drawee *represent* that the signature of the drawer is genuine, or does it merely represent that the instrument is genuine as it purports to be in all respects except as to the signature of the drawer, which the drawee is presumed to know?"

Its answer was that an unrestricted indorsement constituted such a representation as first stated. In *First Nat. Bank of Lisbon v. Bank of Wyndmere*, 15 N. D. 299 (108 N. W. 546), a forged signature to the instrument was involved. The plaintiff in the case was the drawee named in a forged check, and paid the same without discovery of the forgery until later. He brought suit to recover the payment. The court in that case applied in favor of the drawee the ordinary rule of law that money paid by mistake may be recovered, and refused to follow the rule that any exception is allowable because the forgery was in the signature, and not on the back of the instrument. The opinion expressly approved of, and followed, the holding in *McKleroy & Bradford v. Southern Bank*, 14 La. Ann. 458, above cited.

The case of *First Nat. Bank v. Brule Nat. Bank*, 38 S. D. 396 (161 N. W. 616), is cited in the concurring opinion. That was a case involving also a forged signature. The drawee paid the check in the first instance, and later brought an action to recover the money. The court in that case was agreed in result,

but its members differed as to some of the grounds of the decision. Quoting from the majority opinion:

"Section 65 [Negotiable Instruments Act] evidently was intended to create a broader warranty than that created by Section 66, and we incline to the view that these two sections and other sections of the act must be construed together, in an attempt to ascertain the true intent of this new legislation. Prior to this enactment, the courts quite generally held that the implied warranty of genuineness of the signature of the drawer did not extend to the drawee, who was held to be charged with knowledge of the *signature of the drawer;* and it was held that, when a forged instrument had been paid by the drawee, he must bear the loss, in the absence of conduct on the part of the payee which would create an estoppel in favor of the drawee. As above suggested, however, the rule in relation to *forged indorsements and raised instruments was different.* In New York, it was ruled that an indorser was held to a knowledge of his own title and the genuineness of all prior indorsements, and every part of the bill, except the signature of the drawer. *State Bank v. Bank of Omaha,* 87 Neb. 351, 127 N. W. 244, 29 L. R. A. (N. S.) 100; *White v. Continental Nat. Bank,* 64 N. Y. 316, 21 Am. Rep. 612. See note to *Ford v. People,* 7 Am. & Eng. Ann. Cas. 746; note to 10 L. R. A. (N. S.) 49. There is, however, a line of decisions holding that the original payee, by indorsing the instrument, *impliedly warrants,* not only to subsequent holders in due course, *but also to the drawee,* that the *maker's signature* is genuine. *Birmingham Nat. Bank v. Bradley,* 103 Ala. 109, 15 So. 440, 49 Am. St. Rep. 17; *Danvers First Nat. Bank v. Salem First Nat. Bank,* 151 Mass. 280, 24 N. E. 44, 21 Am. St. Rep. 450; *Germania Nat. Bank v. Boutell,* 60 Minn. 189, 62 N. W. 327, 27 L. R. A. 635, 51 Am. St. Rep. 519; *People's Bank v. Franklin Bank,* 88 Tenn. 299, 12 S. W. 716, 6 L. R. A. 724, 17 Am. St. Rep. 884; *Nat. Bank of N. A. v. Bangs,* 106 Mass. 441, 8 Am. Rep. 349; *Warren-Scharf Asphalt Paving Co. v. Comm. Nat. Bank,* 38 C. C. A. 108, 97 Fed. 184. Section 65, supra, we think recognizes and adopts the rule announced in these cases. A review of these decisions, or of those holding that such warranty extends only to indorsees for value in due course, would serve no useful purpose, and would extend this decision beyond reasonable limits. It will suffice to say that we are clearly of

opinion that Sections 65 and 66 of the Negotiable Instruments Act, supra, establish the law in this state, and that the Brule National Bank, by its general indorsement as payee, warranted to the First National Bank of Pukwana that the signature of George Kost upon the check was genuine, and that, in the absence of any act or change of conditions on the part of the latter bank sufficient to create an estoppel, the former bank is entitled to recover the amount of the forged check, upon such warranty. *Gabay v. Doane,* 66 App. Div. 507, 73 N. Y. Supp. 381. * * * The negotiator of the instrument, under the correct interpretation of this section, is the person who, either by indorsement or delivery, first puts the instrument into the ordinary channels through which commercial paper goes into circulation. The warranty intended arises upon his act, and not upon his relation to the instrument in any other respect. His obligation of warranty is not limited by the language of the statute to holders in due course, and therefore extends not only to subsequent holders in due course, but to the drawee. This distinction differentiates the two sections, and explains the reason for placing them both in the same statute. *Neal v. Colburn,* 92 Me. 139, 42 Atl. 348, 69 Am. St. Rep. 495; *Farmers, etc., Bank v. Bank of Rutherford,* 115 Tenn. 64, 88 S. W. 939, 112 Am. St. Rep. 817, and cases cited supra. * * * The indorsement of the check by the Brule National Bank was such as to assign the title to the check to its assignee, the Whitbeck National Bank, and the amount was credited to the indorser. The check bore no indication that it was deposited for collection, and was not in any manner restricted so as to constitute the indorsee the agent of the indorser, nor did it prohibit further negotiation of the instrument, nor did it appear to be in trust for, or to the use of, any other person, nor was it conditional. Certainly the Pukwana Bank was justified in relying upon the warrant of genuineness, which implied the full identification of Kost and his signature by the defendant bank. This view of the statute is in accord with the decisions of many courts. *First Nat. Bank v. State Bank,* 22 Neb. 769, 36 N. W. 289, 3 Am. St. Rep. 294; *First Nat. Bank v. First Nat. Bank,* 151 Mass. 280, 24 N. E. 44, 21 Am. St. Rep. 450; *People's Bank v. Franklin Bank,* 88 Tenn. 299, 12 S. W. 716, 6 L. R. A. 724, 17 Am. St. Rep. 884.''

It is also held in such case that a holder takes the check

upon the credit of his indorser, and not upon the credit of the drawee; and that, when he indorses and presents the check to the drawee, and receives payment thereon, he *warrants* the identity and the signature of the maker, as well as of the indorsers.

I have cited these latter authorities, not for the purpose of urging a change in the rule that pertains to the forgery of signature, but because of their unquestioning recognition of the different rule which prevails in cases involving forgery of an indorsement. It is rendered plain, also, from all the foregoing authorities, that a holder who indorses a check and presents it to the drawee for payment does impliedly represent and guarantee his own title, and this necessarily involves a representation and guaranty of the genuineness of the indorsements. Unless the drawee paid the check to the holder in reliance upon his title, there could be no mistake as a basis of recovery. If he relied and had a right to rely upon the title of the holder who thus presented the check, it is because of the legal implication that the holder represented himself as having a good title. Unless there be such implication, the drawee would have no right to rely upon the title of such holder.

(3) It is urged, however, in the concurring opinion that the payment of the check retired it, and in effect canceled all its indorsements. Of course, the payment of a check by a drawee to its true holder is a complete execution and performance of the contract of every indorser, and of the maker as well. But the payment of the amount of a check to a person who has no title to it (as is assumed herein by the majority) does not retire the check, nor does it have any legal effect upon its indorsers nor upon the maker. Ordinarily there is a true owner in the background. His rights are not affected except by his own election. The maker is still liable to him upon the check. He may demand the possession of the check from the drawee bank. It has been held also that he may, at his own election, treat the previous act of the bank as an acceptance of the check, and demand the proceeds thereof in lieu of the check itself. The fact that there is ordinarily a true owner of a check, to whom the maker continues liable, is an all-sufficient reason why the drawer should ordinarily be protected against spurious indorsements. He is not protected against payment of the check, but against double payment thereof. It is part of the infirmity of plaintiff's case

herein that there is no outstanding true owner of the check other than the Altoona bank. Unless the Altoona bank, as the innocent holder for value, is to be deemed the holder, within the meaning of Section 61, then there is no owner of this check, and the drawer is protected, not against double payment, but against any payment. And this notwithstanding that he made the first mistake, and the very mistake against which Section 61 sought to protect subsequent innocent purchasers. The proposition, therefore, that payment retires the check and cancels the indorsements is of no avail to the litigant who claims that the holder had no title because of the spurious indorsement. The majority decision rests upon this last proposition.

(4) It is further urged in the concurring opinion that an indorser held liable to the drawee on the ground either of negligence or mistake would be in no position to recoup his loss from the drawer, because the drawer does not engage to protect him against his own negligence or mistake. This begs the very question under discussion. It also puts ''negligence'' and ''mistake'' into the same class as grounds of recovery, and ignores the distinction recognized in the very authorities which are cited in the concurring opinion. If there is any question in this case that is settled by all the authorities cited on both sides, it is that there is no burden of proving negligence upon the drawee, as a ground of recovery, in cases where the forgery is in the indorsements. Negligence as a ground of recovery applies only to cases of forged signature. It is enough for the drawee in the case at bar that the money was paid by mistake. In each of the cases cited herein where recovery has been allowed to the drawee, it has been so allowed as against an innocent holder for value. In none of the cases cited on either side of this controversy has ''mistake'' been regarded as destroying the standing of an innocent holder for value. No one could become an innocent holder for value of this check, except by mistake.

Moreover, the holder has no claim against the drawer, if it is entitled to retain the money received by it from the drawee. In such event, its claim is wholly extinguished. It is because it is liable to the drawee for the return of the money that it may assert its right against the drawer, under Section 61. The point made, therefore, pleads as a defense, as against the holder, the very fact which is essential to its recovery.

While it is true that the question of the liability of the Altoona bank to the drawee bank is not before us herein for adjudication, such question is, nevertheless, of almost controlling importance as a part of the logic of the case. Wrong conclusion thereon must logically result in wrong decision on the main question. It is one of the keys to the problem presented for solution.

(5) The concurring opinion urges the point that the guaranty provided by Section 66 of the Negotiable Instruments Act purports to extend only to holders of paper, and that the drawee is not, and cannot be, a holder. This is to be readily conceded. I predicate nothing upon this section. There is authority that Section 65 by its terms carries the guaranty to the drawee. *First Nat. Bank v. Brule Nat. Bank,* supra. I do not press even Section 65 as the basis of liability of a defective title holder to the drawee for the return of the money received. The authorities agree that the right of the drawee in such a case is a right existing at common law. This common-law right is much broader in its application than the field of the Negotiable Instruments Act. It was imbedded in the general law long prior to the enactment of the Negotiable Instruments Act. It is in no manner negatived by the Negotiable Instruments Act. The Negotiable Instruments Act does not exclude the operation of other recognized legal principles not inconsistent therewith. Indeed, it is often, if not always, dependent for its own practical application upon the aid of other legal principles. It would be impracticable to write a statute upon any particular subject which could cover its field with such detail as to exclude the operation of all legal principles not declared therein. General principles of law always operate conjunctively with statutory rights, when not inconsistent therewith. The right to recover money paid by mistake is a long established common-law right, which is not at all confined in its application to negotiable instruments. Nor is its application to be rejected in a case because the Negotiable Instruments Act is involved. Implied warranties are mere legal implications. They arise out of the common law, and are applicable to many subjects. They arise only under appropriate conditions. A purported owner of personal property offering for sale and selling the same is deemed in law to warrant his title thereto. Such legal implication, however, does not arise until he

offers the property for sale. It arises then because elementary justice requires it. Somewhat analogous to this is the legal implication that, when a purported and apparent holder of a check presents it to the drawee for payment, he represents himself as having a good title thereto. Such implication arises because elementary justice requires it. The law which raises such an implication is as broad as the field of litigation, and is not confined in its abode to particular statutes on any subject.

Moreover, a transaction whereby a purported drawee pays unwittingly a check upon a forged indorsement is not, in fact or in law, a negotiable instrument transaction, even though both parties supposed it to be so. The check and the rights of the true owner are unaffected thereby. To speak figuratively, the Negotiable Instruments Law still retained the check and still continued to operate thereon. The attempted transaction was a mistake; and because it was a mistake, the common law awards to the drawee the right to recover its money. This right conflicts with no provision of the statute.

To put the case at bar into a nutshell: The Altoona bank was' in *fact* an innocent holder for value. Is the plaintiff estopped by virtue of the provisions of Section 61 from challenging its *legal* title because of the non-existence of the payee? If not, then what function can be conceived of for this statute in a case of non-existent payee? If yea, then the check becomes legally valid in the hands of the Altoona bank, as an innocent holder for value. If valid as against the drawer, then the drawee was under obligation to the drawer to honor his valid check. By honoring it, he discharged the obligation of the drawer. The first engagement of the drawer under Section 61 was that the check in the hands of an innocent holder for value *would be paid or accepted by the drawee.* His engagement that he himself would pay it was in the alternative. The liability, however, was the same under either alternative, and the drawer has no possible grievance against the drawee for paying the same.

JUSTICE ALBERT joins in this dissent.