## Commonwealth v. Globe Indemnity Company

*Arthur Littleton,* for petitioner.
*William A. Schnader,* Attorney General, contra.

FINLETTER, P. J., October 11, 1934.—Judgment was entered by the Commonwealth upon a bond given by the defendant to secure the Commonwealth against loss of its deposits with Diamond National Bank. The Commonwealth alleges that numerous checks, totaling $25,606.59, were improperly paid by the bank out of the Commonwealth's deposit account and that the bank has refused to restore the sums so improperly paid, thus imposing a liability upon the defendant to make good the losses.

The matter is before us upon a petition for a rule to show cause why the judgment should not be opened, an answer thereto, and a stipulation of admitted facts.

The petition avers that all the checks set forth in the averment of default as improperly charged to plaintiff's account were regularly drawn by the State Treasurer and payment thereof made to holders in due course. The answer to the petition avers that the names of the payees were forged to the endorsements of the checks.

No depositions were taken, but the stipulation of admitted facts sets forth that checks drawn by the State Treasurer upon the Commonwealth's deposit with Diamond National Bank, payable to fictitious and nonexistent persons, were paid by the bank upon endorsements of the names of the fictitious payees, by unknown persons, presumably one Thomas, an employe of the Department of Agriculture, and one Stark, a conspirator with Thomas. Neither the State Treasurer, who drew the checks, nor the Auditor General, who passed upon the requisitions, nor the head of the Department of Agriculture, who submitted the vouchers upon which the checks were based, knew of the nonexistence or of

the fictitious character of the payees. They supposed them to be existing persons entitled to receive the checks.

The checks, 116 in number, were presented to the bank and paid on dates commencing January 9, 1928, and ending August 20, 1929. At the end of each month during this period the canceled checks were returned by the bank to the State Treasurer as charged against the Commonwealth's deposit.

The fraud was discovered by the plaintiff on November 6, 1929, and on November 23, 1929, the bank was notified of the facts by the State Treasurer and a claim for cancellation of the debits made. The interval was necessarily consumed in an investigation of the subject by the plaintiff.

The checks were all drawn in payment of purported claims by owners of tubercular cattle destroyed by order of the Bureau of Animal Industry.

The practice of that bureau and of the other State departments concerned was as follows: Agreements between the cattle owner and the State, showing the value of condemned cattle or, failing that, reports of appraisers, were prepared. After that there followed permits to remove cattle to the slaughter house, autopsies, butchers' statements showing amounts paid owners, and finally a report of the district supervisor, transmitting all the above papers to the Bureau of Animal Industry. A voucher was then approved by the Bureau of Animal Industry, and a requisition by the Secretary of Agriculture followed, calling upon the Auditor General to draw a warrant upon the State Treasurer for the amount due the cattle owner. The requisition and vouchers, but not the supporting papers, were sent to the State Treasurer, who drew the checks payable to the cattle owners and sent them to the Department of Agriculture for distribution. It was the practice of the Department of Agriculture to permit the vouchers to accumulate in its hands until a total of $5,000 was due. The requisition was then made.

Beginning in the fall of 1927, a clerk named Guy H. Thomas and a man not connected with any State department, named Stark, began the fraud which resulted in the drawing of the checks now in dispute. Stark prepared false vouchers and supplied false names of supposed cattle owners, which Thomas then put among the genuine vouchers that were awaiting requisition and payment.

Following the regular course, the checks were mailed to the fictitious names and addresses. How the checks were gotten from the postmasters is not known, or at least is not disclosed in the stipulation. However, endorsements were added by Thomas and Stark and the checks presented for payment to various banks, finally reaching the Commonwealth's depositary which paid them to presenting banks. It does not appear how these banks disposed of the proceeds.

Defendant agrees "that the Commonwealth did not know that the payees were fictitious, or nonexistent, and make no contention that the checks were bearer checks when issued."

Defendant also admits "that the mere fact that an employe of the Commonwealth assisted in the fraud does not charge the Commonwealth with knowledge thereof."

1. Defendant argues that "nowhere in the stipulation is it stated that the endorsements were forged or were made without the authority of the persons whose signatures they purported to be."

The allegations on this subject are contained in paragraph 20 of the stipulation, and, possibly, in paragraphs 5 and 6. The fifth paragraph refers to letters attached to the stipulation, which were sent by the State Treasurer to the bank and wherein the treasurer charges that the endorsements were forgeries.

This is not an allegation of forgery, but only a stipulation that a letter was

sent containing such an allegation. In the sixth paragraph, the stipulation is that "the plaintiff first discovered the facts upon which it bases its assertion of forged endorsements on November 6, 1929." This, of course, is not an admission or stipulation of forgery.

Paragraphs 20 and 22 describe the method of perpetrating the fraud, and allege that neither party knows whether the payees existed or not. As to nonexistent persons, the endorsement of their names by a third party amounts to forgery, because, they being nonexistent, their signatures could not be authorized. To constitute forgery the name alleged to be forged need not be that of any person in existence. It may be wholly fictitious, if the endorsement is made or altered with intent to defraud and shows upon its face that it has sufficient efficacy to enable it to be used to the detriment of another: 26 C. J. 899; Commonwealth v. Bachop, 2 Pa. Superior Ct. 294; Commonwealth v. Smith, 6 S. & R. 568.

But this principle applies only to nonexistent persons. There may however be existing persons who are "fictitious" with relation to the transaction. The stipulation gives us no precise information on that subject. It states that "the parties have no knowledge as to whether or not the names of the payees are existing persons." If any of them were existent, the placing of their signatures by Thomas or Stark to the checks, however otherwise fraudulent it would be, would not amount to forgery if it was authorized by them.

Nowhere, however, in the stipulation is it alleged that the endorsements of the signatures of these possibly existent fictitious persons were authorized by them. On the other hand, it is expressly averred that Stark and Thomas signed the names of all the fictitious persons to the endorsements. This, in the absence of an averment of authority, amounts to an allegation of forgery, especially since the answer to the petition expressly alleges forgery and must, by ordinary rules of equity pleading, stand until it is overcome by proof.

Proceedings like the present are equitable. A petition to open a judgment is in the nature of a bill in equity, and the rules that apply to pleadings and proof in an ordinary equity case govern here: Massey, to use, v. Massey et al., 267 Pa. 239, 248.

Accordingly, averments in the petition, unless denied in the answer, and averments in the answer undenied by depositions are taken as true: McKee v. Verner, 239 Pa. 69. So far as we know of the practice in this county, replications to the answer are not used in such proceedings as the present, the place of the replication being taken by depositions.

In the instant case, therefore, the averment in the answer that the endorsements were forgeries stands until it is denied by the depositions.

2. Defendant argues that the instant case is that of an impostor payee, and that it is ruled by The Land Title & Trust Co. v. Northwestern National Bank, 196 Pa. 230, 237, and States v. First National Bank of Montrose, 17 Pa. Superior Ct. 256.

In the first cited case, an impostor personated the owner of certain real estate and, by showing himself to the drawer of the check to be in possession of the title papers and by the aid of an honest but mistaken introduction to the drawer by a respectable person, induced the drawer to believe that he was the person who owned the land and who, if the transaction had not been fraudulent, would be entitled to the check. The bank delivered the check, intending it should be paid to the impostor. It was held that the drawee bank was justified in paying it to him.

States v. First National Bank of Montrose, supra, was similar. The drawer, deceived as to the identity of the impostor, but intending the check to be paid

to him, was bound by payment of the check to the identical person whom he intended should receive it.

Defendant's application of the principle of these cases is this: "Who then were the payees intended by the Commonwealth? There is only one answer to the question. The payees intended were the persons who induced the Commonwealth to issue the checks, and those persons were Stark and Thomas. The Commonwealth admits that Stark and Thomas induced it to issue the checks by means of unchecked vouchers with checked vouchers. Stark and Thomas, in making up the respective vouchers, assumed the names of the various payees for the purpose of having the Commonwealth issue checks which they could cash. The Commonwealth by accepting these vouchers and issuing checks in the name of the payees dealt with Stark and Thomas under their assumed names, and by issuing the checks intended Stark and Thomas should receive them. The Commonwealth in fact dealt with Stark and Thomas."

It seems to us that to state this theory is to answer it. The Commonwealth did not deal at all with Stark and Thomas. The latter at no time represented themselves to be the named payees. The Commonwealth knew nothing of Stark and Thomas in the transaction. It never could have been deceived by an impersonation by Stark and Thomas of the fictitious cattle owners. The deposit of the false vouchers secretly by the thieves with the good ones conveyed no idea to the Commonwealth that Stark and Thomas were the fictitious payees. Stark and Thomas made no effort to deceive the State Treasurer about their identity. In fact, a new and additional fraud was needed to put Stark and Thomas in possession of the checks. All the Commonwealth did as a consequence of Thomas' act in putting the false vouchers with the good ones (which is the act upon which defendant bases its theory of personation) was to send the checks to imaginary cattle owners with no intention that Stark and Thomas should get them, for their connection with the matter was unknown to the Commonwealth. By no possibility could the Commonwealth have been deceived into thinking Stark and Thomas were the named payees.

Defendant says: "Stark and Thomas induced the Commonwealth to issue the checks by putting the false vouchers with the good ones." True they procured the issuance of the checks, but they did not deceive the State into thinking they were the cattle owners. The State made no mistake about their personality because it never knew they had anything to do with the transaction. It amounts to saying that the head of the department was deceived into thinking that his clerk Thomas, of Harrisburg, with whom he was in daily contact, was Ebenezer Johnson, of Fayette County, who had had his $50 cow slaughtered by the department for the good of the community.

Finally, we may point out that the fraudulent scheme would not send the checks to Thomas and Stark without an additional fraud on the postmaster to induce him to deliver to Stark and Thomas the letters enclosing the checks.

3. Defendant argues that the checks, having been drawn to fictitious persons, were incapable of genuine endorsements, and that it is not reasonable to charge the bank with the consequences of payment of a forged endorsement, when the plaintiff put in circulation checks which were not susceptible of genuine endorsements; and it argues that the case is one for the application of the rule that as between innocent parties he who by his action makes loss possible must bear it.

Two facts must be remembered in discussing the application of this principle to the instant case. In it—the instant case—the fictitious names were put in the checks as payees by the drawer in good faith, in the honest reliance to which he had been induced by the fraud of the criminals, and, second, the defendant

bank paid the checks upon presentation without any identification of the person presenting them, or where they came through a collecting bank without any verification of the endorsements.

Therefore, to hold that the innocent drawing of a check to a fictitious payee (not known to the drawer to be fictitious) is such an act as amounts to drawing it to bearer is to take away all necessity for the rule of the Negotiable Instruments Law, section 9, that to draw a check to a person known to be fictitious is in effect to draw it to bearer.

To our mind the effect of the express provision of the Negotiable Instruments Law that to draw a check to a person known to be fictitious is to draw it to bearer involves as a corollary a rule that if the payee is not known to be fictitious the check is not payable to bearer.

Nor can we see either the equality in equity of the position of such an innocent drawer and the position of the bank, or any negligence of the drawer that could be measured with the negligence of the bank. In our opinion, the drawer who was, without negligence on his part, induced to draw the check to a person who was fictitious but whom he thought to be existent and entitled to the check was guilty of no negligence in drawing the check, while, on the other hand, the bank that paid the check without inquiry into the identity of the person who presented it or verification of the endorsement violated the simplest rule of prudence by which all banks customarily protect themselves, to wit, an identification of the person who presents the check.

The argument that the innocent act of drawing a check to a fictitious person increased the risks and troubles of the bank has no basis in fact—especially under the circumstances of the instant case. No careful bank would pay a check without an identification of the person presenting it. The person who would have the difficulties would be the thief who presented the check. The bank would have only the duty or risk it has in any endorsed check, that is, to require identification. If it had done so and the holder of the check had provided a false show of his identity with the fictitious payee, a different case might or might not be presented. No such facts are alleged in the stipulation.

4. Finally, if both were negligent, the proximate cause of the loss was the neglect of the bank.

Referring to the authorities on this principle and also those cited under the last heading:

In 5 Michie, Banks and Banking, sec. 277 (d), it is said:

"The rule that a bank paying a depositor's check on a forged indorsement is liable to him, unless the payment was the proximate result of his conduct or negligence, applies to a check drawn in favor of a fictitious payee, whom the drawer in good faith and without fault believes to be a real person. The payment of such check cannot operate as payment of any part of the bank's debt to the depositor. The bank is not excused by paying it to the fraudulent holder, unless it takes precautions to determine whether the indorsement is genuine, which involves the ascertainment of identity, and the genuineness of the signature."

See also Michie, section 185, Robertson Banking Co. v. Brasfield, 202 Ala. 167, 79 So. 651, Jones et al. v. The People's Bank Co., 95 Ohio 253, 116 N. E. 34, McCornack et al. v. Central State Bank, 203 Iowa 833, 211 N. W. 542, 52 A. L. R. 1297n, and Jordan Marsh Co. v. National Shawmut Bank, 201 Mass. 397, 22 L. R. A. (N. S.) 250.

"Where by the fraud of a third person a depositor . . . is induced to draw a check payable to a nonexisting person or order, the drawer being ignorant of the fact and intending no fraud, does not authorize the bank to pay it and

charge . . . the account of its customer, although it appears to have been indorsed by the party named therein as payee. Such indorsement is, in effect, a forgery": City of St. Paul v. Merchants Nat. Bank, 151 Minn. 485, 187 N. W. 516, 22 A. L. R. 1221n.

"A bank, paying on forged indorsement a check payable to fictitious person, obtained from maker by fraud of person in whom he had confidence, was guilty of proximate negligence, rendering it liable": Robertson Banking Co. v. Brasfield, 202 Ala. 167, 79 So. 651.

In Brady, Law of Forged and Altered Checks, 264, sec. 59, the law governing cases in which the drawer of the check is ignorant of the fictitious character of the payee is discussed:

"In the cases to be referred to in this section, the drawer of the check is ignorant of the fictitious character of the payee. The check is not regarded as being payable to bearer, but as being payable to a definite payee. And the drawee bank, in paying it, becomes liable to the drawer in that it has made payment on a forged indorsement.

"It will be noticed that in some of the decisions referred to in this section the checks were payable to non-existing persons, characters created by the perpetrator of the fraud for his own purposes of deception; while in others the checks were payable to real persons, to whom, however, the drawer was not indebted and to whom the perpetrator had no intention of delivering them. The drawee bank is liable in either case. The controlling factor is the knowledge of the person signing the check as drawer. If he believes that the payee is real, or that the check represents mony actually due and that it will be delivered to the payee, the check is not payable to bearer, within the meaning of the Negotiable Instruments Law, Section 9, which declares that an instrument is payable to bearer, 'when it is payable to the order of a fictitious or non-existing person, and such fact was known to the person making it so payable.' If the drawee bank pays such a check, except on the authorized indorsement of the payee named, it pays on a forged indorsement and is liable accordingly."

In City of St. Paul v. Merchants National Bank, 151 Minn. 485, 187 N. W. 516, the facts are identical with those of the instant case. See also Strang v. Westchester County National Bank, 235 N. Y. 68, 138 N. E. 739, National Surety Co. v. National City Bank of Brooklyn, 184 App. Div. 771, 172 N. Y. Supp. 413, and Grand Lodge, etc., v. Emporia National Bank et al., 101 Kans. 369.

In Jordan Marsh Co. v. National Shawmut Bank, 201 Mass. 397, an employe of the depositor had caused a large number of checks to be drawn to fictitious payees, whose names he forged. There were 170 such checks drawn during a period of 5 years. The fraud was said by the court to have been made possible, among other causes, by the negligence of depositor's employes. This was made the basis of the defense, but it was held that such negligence was not the proximate cause of the payment of the checks on fraudulent endorsements and that the bank, having failed in its duty to see that the endorsements were genuine, was liable to the depositor. See opinion by Knowlton, J., at page 407.

In United States v. National Bank of Commerce of Seattle, 205 Fed. 433, fraudulent vouchers and checks payable to fictitious payees had been issued for over 3 years by an official and paid out of plaintiff's deposit by the bank. The bank was held liable, the court saying with regard to the bank's negligence (p. 438):

"It was their [the bank's] duty to ascertain whether there was such a person as the payee named in the checks, and to know that the person who presented the checks was entitled to receive the payment thereof. They made no investigation, required no identification, and took no precaution. They paid

the money negligently, and at their own risk, and the defendant bank in choosing to rely upon the identification of the payee by the banks which cashed the checks did so at its own risk."

Defendant cites Marcus v. People's National Bank, 57 Pa. Superior Ct. 345. It was said in that case that "in Land, Title and Trust Co. v. Northwestern National Bank, 196 Pa. 230, the issuing of a check to a fictitious person was included in the class of acts which deprived the depositor of the protection of the rule referred to." That case, however, was an "impostor" case, not one in which the payee of the check was fictitious. Neither in the Marcus case nor in the English case quoted (The Bank of England v. Vagliano Bros., L. R. [1891] A. C. 107) is it clear whether the court referred to a payee known to the drawer to be fictitious or not. It would seem that in the Marcus case the court had in mind cases in which the fictitious character of the payee was known to the drawer, because Snyder v. Corn Exchange National Bank, 221 Pa. 599, is quoted as authority for the negligence shown by drawing a check to a fictitious payee. That case turned on the knowledge of the depositor of the fictitious character of the payee, the court saying that the case came within the Negotiable Instruments Law provision concerning checks to known fictitious payees. The checks were drawn by a clerk authorized by the depositor to draw generally upon the account, who knew, because he created the imaginary payees and forged their names to the endorsements. Snyder v. Corn Exchange National Bank is of course no authority for a presumption of negligence where the drawer supposed the payees to be genuine persons. Neither the Land Title case nor the Snyder case is authority for the case of a drawer who did not know the payee to be fictitious.

Apparently, the court in the Marcus case was moved by the negligence of the drawer in relying upon the forger's representations, for it says (p. 350): "The plaintiff having confidence in Moskovitz accepted his statements. . . . The whole transaction was between the plaintiff and Moskovitz so far as the pretended lending of the money and the payment by the plaintiff to the borrowers were concerned."

5. The drawee bank is liable to the drawer even though the forged endorsement is made by the latter's employe: National Union Fire Ins. Co. v. Mellon National Bank, 276 Pa. 212; Pennsylvania Mutual Life Ins. Co. v. North Penn Bank, 70 Pa. Superior Ct. 34; United Security Life Insurance & Trust Co. v. Central National Bank of Philadelphia, 185 Pa. 586.

In the last case, Justice Mitchell said, after referring to the general rule that knowledge of the agent in the course of his employment is notice to the principal (p. 600): "The rule . . . is founded on the duty of the agent to communicate all material information to his principal and the presumption that he has done so; but no agent who is acting in his own antagonistic interest, or has committed a fraud by which his principal is affected, can be presumed to have disclosed such fraud. It would be contrary to all experience of human nature, on which presumptions are founded", citing Gunster, Assignee, v. Scranton Illuminating, Heat & Power Co., 181 Pa. 327.

See also Schwarz v. Bank of Pittsburgh National Assn., 283 Pa. 200.

6. Furthermore, the Commonwealth was not negligent in failing to discover the forgeries sooner than it did, because the duty of the depositor to examine his account and canceled checks does not extend to the discovery of the forged endorsement of the payee of a check when there is no reason to suspect that payment has been made to the wrong person: United Security Life Insurance & Trust Co. of Pa. v. Central National Bank of Philadelphia, 185 Pa. 586. This

case was cited in Califf v. First National Bank of Towanda, 37 Pa. Superior Ct. 412, 417, where the court said:

" 'On the settlement of his bank book and the return of his checks the depositor is not bound to examine the latter to see that the indorsements are correct. He may assume that the bank has ascertained their genuineness before paying. A bank book settled, balanced up and checks returned to the depositor, will of course become an account stated if not promptly examined and errors of amount pointed out for correction, but the depositor is under no obligation to follow up and ascertain the genuineness of the indorsements that carry the title after the check has left his hands:' United Security Life Ins., etc., Co. v. Bank, 185 Pa. 586. . . ."

The bank was notified of the forgeries promptly after their discovery. This is the limit of the duty of the depositor with regard to forged endorsements: McNeely Co. v. Bank of North America, 221 Pa. 588; Connors v. Old Forge Discount & Deposit Bank, 245 Pa. 97; Lesley v. Ewing, 248 Pa. 135.

The Commonwealth therefore was not negligent in failing to discover the forgeries immediately.

7. It is suggested that the plaintiff was negligent in its methods of audit (1) in view of certain statutes, and (2) by carelessness in fact.

Taking up the latter subject, was the State Treasurer careless in drawing the check upon receipt of the vouchers and requisition only? We think not. The "supporting papers" were most carefully prepared. They are the statements of the subordinate officials who dealt with and knew the facts at first hand. These were examined by the bureau immediately concerned and sent to the Department of Agriculture. On examination by that department, the voucher and requisition were prepared. Can it be said that the treasurer must hear proof of the condemnation and slaughter of the cattle? Any such practice would be so impracticable that it might properly be called absurd. Confidence must be reposed somewhere in handling such and so numerous transactions.

We think the care shown in the preparation of the "supporting papers" entirely justified the treasurer in drawing the checks. To be sure, an artful thief discovered a loophole through which he could extract the public money, but the situation does not differ in substance from the everyday forgery of his employer's check by a dishonest clerk.

See Los Angeles Investment Co. v. Home Savings Bank of Los Angeles, 180 Cal. 601, 182 Pac. 293, for a similar case.

8. Defendant contends that there was an insufficient audit within the meaning of section 1502 of The Fiscal Code of April 9, 1929, P. L. 343, which provides: "All requisitions shall be audited by the Department of the Auditor General, and, if they appear to be lawful and correct, the department shall approve them and transmit them to the Treasury Department for examination and approval. Otherwise, they shall be returned", etc.

We do not interpret this statute as requiring that the Auditor General shall hold a semi-judicial hearing of evidence in support of every claim. Such is not the provision of the statute, which is that all requisitions shall be audited and if they appear to be lawful and correct "they shall be approved."

It is to be presumed that the State officials knew the practice of the executive departments. The treasurer therefore knew of the care taken with the supporting papers, concerning which no criticism has been or can be made, and knew that the requisitions were founded upon them. There was nothing then to give an appearance of illegality or fraud that would require further examination.

For these reasons the rule to open judgment should be discharged.